# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## SOUTHERN DIVISION

| | |
|---|---|
| AMY L. WELLMAN,<br><br>    Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>    Defendant. | 4:16-CV-04159-LLP<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Plaintiff, Amy L. Wellman, seeks judicial review of the Commissioner's

final decision denying her payment of disability benefits under Title II and Title

XVI of the Social Security Act.[1] Ms. Wellman has filed a complaint and has

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits
are sometimes called "Title II benefits." Receipt of both forms of benefits is
dependent upon whether the claimant is disabled.   The definition of disability
is the same under both Titles.  The difference –greatly simplified--is that a
claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage"
status (calculated according to one's earning history), and the amount of
benefits are likewise calculated according to a formula using the claimant's
earning history.  There are no such "coverage" requirements for SSI benefits,
but the potential amount of SSI benefits is uniform and set by statute,
dependent upon the claimant's financial situation, and reduced by the
claimant's earnings, if any.  There are corresponding and usually identical
regulations for each type of benefit.  See, e.g. 20 C.F.R. § 404.1520 and
§ 416.920 (evaluation of disability using the five-step procedure under Title II
and Title XVI).  In this case, Ms. Wellman filed her application for both types of
benefits.  AR232, 234,243, 271.  Her coverage status for SSD benefits expires
on December 31, 2018.  AR48.  In other words, in order to be entitled to Title II
benefits, Ms. Wellman must prove she was disabled on or before that date.

requested the court to reverse the Commissioner's final decision denying her

disability benefits and to enter an order awarding benefits.   Alternatively,

Ms. Wellman requests the court remand the matter to the Social Security

Administration for further hearing.  The Commissioner asks this court to affirm

its decision below.  The matter is fully briefed and has been referred to this

magistrate judge for a report and recommendation.  For the reasons more fully

explained below, it is respectfully recommended to the district court that the

Commissioner's decision be reversed and remanded.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is

properly before the district court pursuant to 42 U.S.C. § 405(g).  This matter

was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and

the October 16, 2014, standing order of the Honorable Karen E. Schreier,

United States District Judge.

## FACTS[2]

### A.    Statement of the Case

This action arises from Plaintiff Amy L. Wellman's application for SSDI

benefits protectively filed on October 7, 2013, and SSI benefits protectively filed

on January 23, 2014, alleging disability since October 7, 2013, due to severe

---

[2] The facts were agreed upon and stipulated to by the parties.  See Docket 11.
The facts recited in this opinion are from the parties' submission, with the
exception that paragraph numbers have been deleted, some headings have
been altered, and some grammatical and/or stylistic changes have been made.
Citations to the appeal record will be cited by "AR" followed by the page
number(s).

depression, high anxiety, lack of concentration and ability to focus, borderline personality disorder, avoidant personality disorder, schizotypal personality disorder, pseudotumor cerebri,[3] headaches, asthma, and allergies--including perfume allergies. AR232, 234, 243, 271. She subsequently added agoraphobia, celiac disease, and mitral valve prolapse to her list of impairments. AR310, 312, 319.

Ms. Wellman's SSDI application contains the statement that "I have filed or intend to file for SSI." AR232. Ms. Wellman's claim was denied initially and upon reconsideration. AR166, 173, 180. Ms. Wellman then requested an administrative hearing. AR188.

Ms. Wellman's administrative law judge hearing was held on August 25, 2015, by the Honorable Denzel R. Busick ("ALJ"). AR75. Ms. Wellman was represented by other counsel at the hearing, and an unfavorable decision was issued on September 23, 2015. AR43. Plaintiff's current counsel then appeared to appeal her hearing denial. AR18.

At Step One[4] of the evaluation, the ALJ found that Ms. Wellman's work after the alleged onset date of October 7, 2013, was not performed at the

---

[3] A pseudotumor cerebri is where the pressure inside one's skull (intracranial pressure) increases for no obvious reason. Symptoms mimic those of a brain tumor, but no tumor is present. Symptoms can include headaches; ringing in the ears; nausea, vomiting or dizziness; blurred or dimmed vision; double vision; brief episodes of blindness; seeing light flashes; and neck, shoulder, or back pain. See https://www.mayoclinic.org/diseases-conditions/pseudotumor-cerebri/symptoms-causes/sys-20354031. Last checked October 24, 2017.

[4] See Section B of the DISCUSSION section of this opinion for a description of the 5-step analysis applicable to disability determinations.

substantial gainful activity ("SGA") level, and that she was insured for SSDI purposes through December 31, 2018. AR48.

At Step Two, the ALJ found that Ms. Wellman had severe impairments of pseudo-tumor cerebri, status post VP shunt placement with revision; asthma; obesity; affective disorder; anxiety disorder; and personality disorder. AR48.

The ALJ also found that Ms. Wellman had non-severe medically determinable impairments of the right lower extremity; chip fracture of the tibia and posterior tibial tendon dysfunction; and post laparoscopic lap band surgery with subsequent removal. AR48.

The ALJ found that Ms. Wellman did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (20 CFR § 404.1520(d)) (hereinafter referred to as the "Listings"). AR49-50. The ALJ found that Ms. Wellman had mild limitations in activities of daily living, and moderate limitations in concentration, persistence and pace, and in social functioning. AR49. The ALJ noted a short-term psychiatric hospital stay from January 17-21, 2014, but no episodes of decompensation of extended duration. AR49. The ALJ stated that the term "mild" as used herein and defined at the hearing, means slightly affected but not interfering with work activity, while "moderate" means affected, not precluded, such that a person is performing at lower acceptable limits for most workplaces. AR49.

The ALJ determined that Ms. Wellman had the residual functional capacity ("RFC") to perform:

> light to medium work as defined in 20 CFR 404.1567(b) and
> 416.967(b). She can do so, as follows: She can lift and carry 30

4

pounds occasionally and 15 pounds or less frequently. She can sit a total of 6 hours, as well as stand and walk, combined, a total of 6 hours in an 8-hour workday. She has no limits in reaching. She has no postural limits and no limits in climbing stairs or ladders. She has no manipulation limits, no visual limits with glasses, and no communication limits. She must avoid any concentrations of dusts, fumes, odors, gases, aerosols in the air, and poor ventilation. Due to non-exertional mental limitations, as discussed, *supra,* she is essentially limited to jobs involving only brief and superficial contact with others while performing simple, routine and repetitive tasks of about three steps on average.

AR50.

The ALJ's credibility finding regarding Ms. Wellman's statements concerning the intensity, persistence and limiting effects of her symptoms was that they were not "entirely credible for the reasons explained herein." AR51. The ALJ discussed the medical evidence in evaluating Ms. Wellman's credibility, and he discussed her good work history, which he stated provides some positive probative weight in her allegations of disability. AR51-55.

When discussing Ms. Wellman's mental condition, the ALJ stated, "The undersigned notes that evidence does not support a finding that she experienced any full and continuous 12-month period when her ability to function fell below the above RFC," and stated again later in the decision:

However, evidence does not support a finding that she experienced any full and continuous 12-month period from either the July 2013 ending of her employment at Metabank or from her October 2013 alleged onset date when her functioning fell below that identified in her above mental RFC. She reported longstanding struggle with depression and anxiety, including panic attacks, dating back over the past 10 years (Ex. 18F, pgs. 31-32). However, she has shown herself capable of consistently engaging in SGA for better than two decades extending until about the alleged onset date typically in skilled work (Ex. 5D; 2E and 16E). Her prior ability to perform such work despite reported history of depression and anxiety suggests that she remains capable of sustaining

mental work-related activities at least at a level identified in the above RFC, particularly given her apparent improvement with treatment.

AR54.

The ALJ considered the opinions of the state agency medical consultants who found that Ms. Wellman did not have any severe physical impairments, and gave their opinions "less weight." AR56. The ALJ stated, "However, the undersigned is satisfied that the claimant's combination of physical impairments effectively limit her to essentially light level work activity as identified in the above RFC. The undersigned accepts that her history of headaches when combined with mental impairments, result in a level of limitation as identified in both the above RFC." AR56.

The ALJ considered the pulmonary RFC questionnaire of R. Maclean Smith, M.D., and asserted he said Ms. Wellman had some limitations secondary to asthma which would occasionally interfere with attention and concentration needed to perform even simple work tasks, and Ms. Wellman would need to avoid even moderate exposure to perfumes, fumes, odors, gases, and dust as well as avoiding all exposure to cigarette smoke, and that she would likely miss work once every two months because of respiratory issues. AR56.

The ALJ gave Dr. Smith's assessment "partial weight," because Dr. Smith saw the claimant only a couple of times during the period under consideration including visits of July, 2014, and July, 2015, when Ms. Wellman was doing well during those visits from both a subjective and objective standpoint, and

she has generally otherwise presented over time with no particular respiratory deficits identified. AR56. The ALJ also stated Dr. Smith noted that even with rare asthma attacks, they had been only mild to moderate, and he identified her prognosis as "good." AR56. The ALJ then found, "Thus, it is not likely that she would have particular exacerbation with respiratory issues with medication management and avoiding any concentrations of dusts, fumes, odors, gases, aerosols in the air, and poor ventilation as identified in the above RFC." AR56.

The ALJ considered the opinions of the state agency psychological consultants and gave them "considerable weight" because their assessments were "reasonably consistent with the record and the conclusion of limitations in keeping with the above mental RFC." AR56.

The ALJ considered the mental limitation questionnaire of Michalene Stevermer, D.O., and gave Dr. Stevermer's assessment "some weight" because the overall record does not support a finding of limitations in general causing greater limitation than allowed in the above RFC. AR56. The ALJ accepted Dr. Stevermer's mild and moderate limitations as reasonably consistent with the overall record and her mental RFC as established, but asserted that the marked limitations Dr. Stevermer identified applied only as to the skilled-level work Ms. Wellman previously performed. AR56-57.

Based on the RFC determined by the ALJ, the ALJ found that Ms. Wellman had carried her burden at Step 4 to show that she was unable to perform her past relevant work. AR57.

At Step 5, relying on the testimony of a vocational expert, the ALJ found that an individual with Ms. Wellman's age, education, past work experience, and RFC could perform the occupations of office helper, DOT# 239.567-010 and telephone survey worker, DOT# 205.367-054, and he denied the claim. AR58-59.

Ms. Wellman timely requested review by the Appeals Council (AR18) and submitted additional evidence (AR8, 19-42, 65-74, 834-83) consisting of:

a. Letters from Ms. Wellman's short-term disability while working at Meta Bank, dated June 20, 2013 to July 24, 2013, with a hand-written note on the July 24, 2013, letter dated August 5, 2013, showing she was terminated.

b. Letters from her employer regarding FMLA usage showing all available leave had been consumed dated June 12, 2013 and June 21, 2013.

c. FMLA certification of health care provider related to psychological impairments dated June 6, 2013.

d. FMLA certification of health care provider related to respiratory impairments dated June 10, 2013.

e. Medical records from Avera McGreevy-West clinic dated March 19, 2014 to October 6, 2015.

f. Medical records from Southeastern Behavioral Healthcare-caseworkers records dated April 21, 2014 to January 7, 2016.

g. Medical records from Southeastern Behavioral Healthcare-psychological records dated October 5, 2015 to January 11, 2016.

h. Medical records from Southeastern Behavioral Healthcare-counseling records dated June 18, 2015 to January 6, 2016.

The Appeal Council denied the request for review stating:

In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council [AR5-Exhibits 17E, 21F, 22F, and 23F]. We considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

We also looked at treatment records from Southeast Behavioral Healthcare, dated September 29, 2015-January 7, 2016; and from Anna McGeevy West Clinic, dated October 6, 2015-January 9, 2016. The Administrative Law Judge decided your case through September 23, 2015. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before September 23, 2015. If you want us to consider whether you were disabled after September 23, 2015, you need to apply again.

The Appeals Council denied Ms. Wellman's request for review on September 22, 2016, making the ALJ's decision the final decision of the Commissioner. AR1. Ms. Wellman then timely filed this action.

## B.     Plaintiff's Age, Education and Work Experience

Ms. Wellman was born June 9, 1968, and completed college in 2005. AR232, 234, 272. The ALJ identified Ms. Wellman's past relevant work as account processor, business mapping specialist, software developer, and technical support professional---all skilled past work. AR57.

## C.     Relevant Medical Evidence

### 1.     Midwest Psychiatric Medicine

The first record in the appeal record related to Ms. Wellman's mental health impairments was a recheck exam at Midwest Psychiatric Medicine on August 1, 2012. AR562. Her mental status exam was described as good and she was feeling less anxious and better able to focus/concentrate at work.

AR563.  She reported doing okay, and the note described her as really doing well, coping much better, with more "good" days than "bad," using less daytime clonazepam, usually about 5 days per month, but still takes it at night in order to sleep.  AR564.  She reported work was going better and she felt positive about things.  AR564.  Her diagnoses were recurrent major depression and anxiety, and her clonazepam and Zoloft were continued and additional counseling was recommended in the fall near the anniversary of her sister's death.  AR565.

Ms. Wellman was seen again on January 31, 2013, and her mental status exam was generally good, with mildly anxious mood.  AR568.  She described her anxiety as manageable and she utilizes deep breathing often.  AR568.  The mental status findings showed she had good appearance, grooming and hygiene, she was coping well, oriented, her memory was grossly intact, she had good attention, concentration, language, fund of knowledge, insight and judgment, she had normal psychomotor activity, thought process, speech, and intact thought content, abstract reasoning, associations, and computations.  AR568.  Her medications were not changed.  AR569.

Ms. Wellman was next seen on May 30, 2013, and had very high anxiety, feeling "super stressed," not coping well.  AR573.  She reported both her brother-in-law and her niece, the daughter of her sister who had committed suicide, both attempted suicide.  AR573.  She also reported a recent flare up of her celiac disease, allergic reactions, asthma attacks, and missing a lot of work.  AR573.  She was still working full-time at Meta Payment Systems, but

was finding it difficult to even leave her house.  AR573.  She reported a down mood with scary, negative, intrusive thoughts, feeling hopeless, very high anxiety, panicky at times when she leaves her house, sleeping tons and still not feeling rested, and eating too much.  AR572.

The mental status examination revealed normal orientation x 3, grossly intact memory, fair attention/concentration (distracted by anxiety), good language and fund of knowledge, affect that was congruent, tearful and anxious, mood that was anxious, worried and dysthymic, and normal psychomotor activity with no tic.  AR573.  She had no abnormal thoughts, but was struggling with some ruminating worry, self-loathing, obsessive, locked-in thoughts. AR573.  Her insight/judgment was fair, content of thought was logical and coherent, her rate of thought was normal but she had lots of racing thoughts and anxiety currently, her reasoning, computation and association were all intact, and her speech, volume of speech, articulation, and coherence and spontaneity of speech were all normal.  AR573.  Her clonazepam and Zoloft were continued and risperidone added.  AR574.  Therapy was strongly recommended, and if her primary care was not comfortable completing FMLA paperwork for her the nurse practitioner would complete it for protective leave due to anxiety relapses/exacerbations.  AR574.

A certification of health care provider for FMLA leave for Meta Payment Systems was completed on June 6, 2013, which stated that Ms. Wellman would likely miss work 1-2 days per month due to her acute relapses of

depression and anxiety.  AR835.  Ms. Wellman obtained and submitted this certification to the Appeals Council.  AR8.

Ms. Wellman was next seen on September 3, 2013, for a recheck. AR577.  Since her May appointment she had been hospitalized from June 17 to June 21 at Avera Behavioral Health and then in a partial hospitalization program from June 25, 2013, to July 23, 2013.  AR577.  Her Risperdal had been increased and she began therapy with Dr. Sweatman.  AR577.  She still reported doing okay overall, but had quit her job after the partial hospitalization program, and moved in with her parents due to financial constraints.  AR577.  She also reported taking a 12-day vacation with her mom, covering 1200 miles throughout the South, which she enjoyed "98% of the time."  AR577.  Ms. Wellman reported more frequent headaches, with an appointment scheduled with Dr. Asfora and that she was still looking for work but wondering how much she would work and about disability.  AR577. Ms. Wellman's mood was okay; her anxiety was better with Risperdal, but was still high and was taking clonazepam twice daily.  AR577.

Ms. Wellman informed the state agency that she was receiving counseling from Dr. Sweatman at Midwest Psychiatric, and the state agency contacted claimant's third party to inform them they had recently received records from there, but they did not include any counseling records.  AR111, 312.

Ms. Wellman was seen on March 5, 2014, and the mental status exam revealed she had an overweight appearance, fair eye contact, non-pressured

speech, slowed psychomotor activity, neutral mood, flat affect, fair insight and judgment, and otherwise normal thought process, thought content, memory, fund of knowledge, and orientation. AR761-62. The progress note indicated she had been struggling since her discharge from the hospital until the past week with continued anxiety and depression, sleeping excessively, and pacing a lot. AR762. Ms. Wellman's clonazepam had been increased and she had been scheduled for a psychiatric and therapy follow-up at Southeastern Behavioral Healthcare. AR762.

### 2. Southeastern Behavioral Healthcare

Ms. Wellman began care at Southeastern Behavioral Healthcare ("SEBH") on January 31, 2014, meeting with her caseworker; her mood was anxious with congruent affect. AR757. She reported she had been quite anxious since leaving the hospital and was extremely anxious at the appointment. AR757.

Ms. Wellman continued to meet regularly with her caseworker, and received assistance planning her care, discussing her problems and assistance with other items. AR753-54. On February 24, 2014, she discussed a SSA disability form of her activities she needed to complete and she was overwhelmed thinking about answering the questions. AR751. On March 24, 2014, Ms. Wellman reported she was still waiting on a decision from Social Security, and some days she wakes up and thinks she could go back to work, but once she had to leave the house she could not. AR749.

Ms. Wellman was seen for psychiatric treatment on April 15, 2014. AR744. She reported she was depressed and was having sleep issues since

leaving the hospital in January, had lost 30 pounds since the prior September, her focus and concentration were altered, she felt hopeless, she had problems leaving her house, lacked motivation for self-care, was socially withdrawn, and had ongoing suicidal thoughts. AR744. Ms. Wellman reported that her first psychiatric inpatient treatment was eight years ago, her second admission was five years ago, and then again in June, 2013, and January, 2014. AR745. She also reported seeing Connie Sweatman at Midwest Psych for counseling monthly. AR745. Physically she reported low back pain, headaches from her pseudotumor cerebri, asthma, allergies, sleep apnea, mitral valve prolapse, celiac disease, and obesity. AR745.

Her mental status exam revealed some psychomotor retardation, fairly good grooming and hygiene, not overly restless or fidgety, intermittent to avoidant eye contact, blunted to dysphoric affect, slowed and deliberate speech, and had frequent suicidal thoughts with a plan but no intent, and the mental status was otherwise normal with goal-directed thoughts, no flight of ideas or looseness of associations, and no psychosis symptoms. AR746-47.

She was diagnosed with major depression, anxiety with panic features, generalized anxiety disorder with panic features, borderline personality disorder by history, and avoidant schizotypal and borderline features by history. AR747. She had an estimated GAF of 50-55, and had moderate to severe stressors, grief and loss, family issues, significant personality disorder problems, and limited social support. AR747. Due to financial problems she could not afford therapy so was encouraged to work with her pastor until she

can get into ongoing therapy through SEBH, and her medications were continued. AR748.

Ms. Wellman was seen again on May 13, 2014, and she reported her anxiety had improved some day-to-day, but she could not go outside yet, but did so 1 to 3 times a week. AR742. She had not been taking the daytime Klonopin as prescribed because she was afraid it was too sedating. AR742. Her mental status exam revealed blunted affect, dysphoric mood, slowed psychomotor, intermittent eye contact, had passive thoughts of dying, and was otherwise normal as she was alert and cooperative, not overly restless or fidgety, non-pressured speech, no mania or hypomania, and no psychotic indices. AR742. Her GAF was estimated at 50, she was told to take the Klonopin as prescribed, and encouraged to work with her caseworker to get into a grief group or support group. AR742-43.

Ms. Wellman was seen on July 14, 2014, for psychiatric follow-up and reported she had been forcing herself to leave her home more often and become more active, but she does experience anxiety when she leaves her home although less than in the past. AR818. She reported having panic attacks when she leaves her home although less than in the past. AR818. She reported having panic attacks where she becomes hot, shaky, and experiences racing thoughts about once every two weeks. AR818. Her mental status exam revealed somewhat slowed psychomotor activity, poor eye contact, slowed and soft speech, "good" mood, congruent affect with restricted range, fair concentration, attention span, insight and judgment, and otherwise normal

memory, fund of knowledge, and thought processes.  AR818.  Ms. Wellman's clonazepam was decreased, and other medications were left unchanged. AR819.

Ms. Wellman was seen again on October 20, 2014, and she reported "doing okay for the most part," but was struggling with insomnia, decreased energy, and her anxiety was somewhat better, but was still having panic attacks every other week and only leaving her home two to three days per week.  AR811.  Her existing medications were continued, and Remeron added. AR812.

Ms. Wellman was seen on January 19, 2015, for psychiatric follow-up and reported her depression and anxiety had improved since beginning on Remeron.  AR808-09.  However, she reported not being very active, not leaving the house much and having increased anxiety when she did.  AR809.  Her existing medications were continued and trazodone was added for insomnia. AR809.

Ms. Wellman was seen on March 30, 2015, for psychiatric follow-up and her symptoms, problems, treatment and status were largely unchanged. AR805-07.  The mental status findings showed fair grooming and hygiene, slowed psychomotor activity, purposeful and voluntary movement, fair eye contact, clear, non-pressured, slowed and soft speech with concrete answers, a cooperative and pleasant attitude, a "pretty good" mood, affect was mood congruent with blunted range, she had no suicidal or homicidal ideation, plan or intent, no hallucinations, loosening of associations, tangential or

circumstantial thoughts, she was alert and oriented, cognition and memory functions were intact, fund of knowledge was average, and judgment and insight were fair.  AR806.

Ms. Wellman was seen on July 20, 2015, for psychiatric follow-up and reported increased anxiety and depression, but improved sleep.  AR802.  She reported feeling hopeless, poor interest in things, fatigued, decreased concentration, suicidal thoughts, increased anxiety, and some PTSD symptoms including flashbacks and nightmares to being molested by her father.  AR802.  Her mental status exam revealed she appeared anxious, poor eye contact, slowed speech, increased psychomotor activity, depressed and anxious mood, congruent and blunted affect, passive suicidal thoughts, fair insight and judgment, and otherwise normal memory, fund of knowledge, thought processes, and cognitive function.  AR803.  Her clonazepam was increased, and individual therapy scheduled to start in a week.  AR804.

Dr. Stevermer, a psychiatric resident who treated Ms. Wellman, completed a mental limitations form regarding what Ms. Wellman's limitations would be if she attempted full-time work.  AR828.  Dr. Stevermer's checkmarks indicated her main limitations were in sustained concentration and persistence, social interaction and adaptation.  AR828-29.  Ms. Wellman had moderate limitations in performing activities within a schedule, in working in proximity to others without being distracted, in getting along with co-workers and others without distracting them, in using public transportation or going to unfamiliar places, and in setting realistic goals.  AR829-30.  Dr. Stevermer

opined that while Ms. Wellman had a number of other mild limitations, she was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of breaks. AR829. Dr. Stevermer's supporting remarks said Ms. Wellman "has fairly significant anxiety symptoms which have interfered with her day-to-day functioning as well as depression symptoms which has led to poor concentration and decreased motivation." AR830.

Ms. Wellman submitted additional SEBH records to the Appeals Council including caseworker treatment notes from April 21, 2014 to January 7, 2016. She continued to meet regularly with her caseworker and discussed her problems, treatment, and coping. AR842-68. Ms. Wellman continued to receive caseworker assistance after the ALJ's decision from September 29, 2015, to January 7, 2016. AR28, 38 (records submitted to Appeals Council).

Ms. Wellman began individual counseling therapy at SEBH on July 29, 2015, and submitted those records to the Appeals Council. AR869. Ms. Wellman reported being depressed, and was having suicidal thoughts, and a crisis plan was developed. AR869. The counselor offered to accompany Ms. Wellman to the psychiatric hospital for an assessment, but she declined. AR869. Ms. Wellman missed her next session on July 31, 2015, due to increased anxiety. AR872. Ms. Wellman continued therapy on August 31, 2015, through September 16, 2015, with a focus on discussing her depression and anxiety and coping methods. AR873-83.

Ms. Wellman continued to receive individual counseling after the ALJ's decision from October 20, 2015, to December 21, 2015. AR27, 30, 35 (records submitted to Appeals Council). At the last counseling session in the record on December 21, 2015, the counselor encouraged more regular attendance at the sessions and suggested they revert back to weekly sessions instead of every other week. AR35.

Ms. Wellman submitted additional SEBH records to the Appeals Council including psychiatric treatment notes from October 5, 2015, to January 11, 2016. AR20-22, 39-42 (records submitted to Appeals Council). When she was seen on October 5, 2015, she reported some improvement and her medications were continued unchanged. AR20-22. However, when seen on January 11, 2016, she was having a difficult time leaving her house, and as a result she had missed about half of her counseling appointments. AR40. Her mental status exam revealed poor eye contact, slowed speech, anxious mood, congruent mildly downcast and slightly restricted affect, some mild thought blocking at times, and fair concentration, attention span, and judgment with limited to fair insight. AR41. Ms. Wellman's Risperdal was increased and her mirtazapine stopped. AR41.

### 3.    Avera Behavioral Health Hospital

Ms. Wellman was admitted to the mental health hospital on June 17, 2013, due to suicidal thoughts, described as passive death wishes and thoughts of wanting to hurt others, and her GAF was assessed at 40. AR698, 707. Ms. Wellman had met with her HR director at work five days earlier and

19

been told that she had exhausted all but 7 hours of her FMLA protection and he felt she should terminate her job or take short-term disability. AR698. Following inpatient "DBT" treatment and work with Dr. Sweatman, Psy.D., she was discharged to the partial hospitalization program, and continued individual therapy on June 21, 2013. AR698-99.

Ms. Wellman was in the Avera Behavioral Health Partial Hospitalization program from June 25, 2013, to July 24, 2013. AR684-91.

Ms. Wellman was hospitalized again due to suicidal thoughts for inpatient treatment from January 17, 2014, to January 21, 2014. AR663-65. She had become overwhelmed at her job of two months and decided to quit, which left her unemployed. AR665. Ms. Wellman's unemployment and difficulty functioning at work led her to feeling suicidal with a plan to overdose. AR665. The doctor noted Ms. Wellman had a history of difficulty sustaining employment with both high pressure and low pressure jobs. AR665. She received dialectical behavior therapy, and after several days in the hospital with group and individual counseling she felt safe to return home. AR665. The doctor noted that she was encouraged by the plan for her to receive case management at SEBH and was resolved to work on filing for disability. AR664-65.

### 4. Avera McGreevy Clinic

Ms. Wellman was seen at Avera McGreevy West Urgent Care Clinic on July 20, 2012, complaining of right ankle and foot pain and an x-ray revealed a chip fracture of the tibia and she was placed in a walking boot. AR371. She

also reported a sprain of the right ankle four weeks earlier as well as a bad ankle injury 10 years earlier.  AR371.

Ms. Wellman was seen again on August 3, 2012, with continued right ankle pain and referred to Dr. Craig Smith.  AR368.

Ms. Wellman was seen on August 29, 2012, for a preoperative exam prior to VP shunt placement for pseudotumor cerebri scheduled for August 31, 2012, and she was approved for surgery.  AR362-64.

Ms. Wellman was seen at the Avera McGreevy West Clinic on June 5, 2013, by Dr. Feistner complaining of fatigue and dizziness, and a history of allergies, celiac disease, and mental health issues was noted.  AR343.  She also reported bilateral head or ear pain.  AR345.  Ms. Wellman had been experiencing suicidal and racing thoughts recently and had seen Dr. Laura Withhorn who prescribed Risperdal, but that was changed to Zofran due to side effects.  AR347.  FMLA paperwork was also discussed due to Ms. Wellman's work absences, and Dr. Feistner felt her absences were probably due more to stress and depression so Dr. Withhorn should complete the FMLA forms.  AR347.

Ms. Wellman was seen on March 18, 2014, for a wellness exam and reported that her last year had been a struggle psychiatrically, and she had been working with Dr. Bahnson and seeing someone at Southeastern Behavioral Health due to financial constraints.  AR726.  The treatment note stated she reported that she was currently not working and thinking of

applying for disability. AR726. She was alert and oriented with clear speech. AR727.

The additional treatment records from Avera McGreevy West Clinic for March 19, 2014 to October 6, 2015, were submitted to the Appeals Council. AR8.

### 5. Allergy and Asthma Clinic

Ms. Wellman was seen on October 28, 2012, at the allergy clinic for follow-up on "AR, VMR, Angioedema, Asthma." AR549. The treatment notes are hand-written and difficult to read. AR549. The records do indicate that Ms. Wellman reported her asthma had been okay, she had bronchitis following her second ventricular shunt surgery, her throat swelling is helped if she uses Astelin earlier in the evening, and she'd only had one episode of throat swelling due to cologne. AR549.

Ms. Wellman was seen on June 10, 2013, and reported bad allergies for the past two months with multiple symptoms including breathing problems and headaches. AR550. She reported she had been missing work due to her allergies and had bronchitis three times through the winter. AR550. Her FEV1/FVC ratio was 89%. AR548, 550. Prednisone and Xyzal were prescribed. AR550.

Ms. Wellman's representative submitted to the Appeals Council a certification of health care provider from Dr. Smith for an FMLA leave request to Meta Payment Systems on June 10, 2013. AR838. Dr. Smith stated that Ms. Wellman "may miss a few days of work" because her respiratory symptoms

were poorly controlled despite medical treatment, and he estimated she would likely miss one day every two months.  AR840.

Ms. Wellman was seen on June 24, 2013, for skin tests which showed positive results to multiple dust/pollens and mold/dander.  AR547, 551.

Ms. Wellman was seen on July 25, 2014, and reported she was a lot better with 8-9 months since her throat had swelled and needed to use an epi pen, and had not needed the Xopenex inhaler for five months.  AR782.  When seen again on July 9, 2015, her report was similar and she had not needed the epi pen in the last year.  AR783.

On August 18, 2015, Dr. Smith completed a pulmonary RFC questionnaire and stated that Ms. Wellman had allergic rhinitis, vascular rhinitis, asthma, and chronic angioedema, and he had been treating her since 2006.  AR831.  He stated that she had asthma attacks due to allergens, but rarely.  AR831.  When asked about interference from her symptoms in the workplace, Dr. Smith said she would occasionally experience symptoms severe enough to interfere with her attention and concentration due to a decreased threshold for irritants ("fragrance, smoke"), and Ms. Wellman had reported issues with fragrances in some office settings to him. AR831.  Dr. Smith specifically stated Ms. Wellman needed to avoid all exposure to cigarette smoke, and even moderate exposure to perfumes, fumes, odors, gases and dust.  AR832.  Dr. Smith stated that about one day every one or two months she would be absent from work due to her respiratory problems.  AR832.

### 6. Orthopedic Institute

Ms. Wellman was seen on August 6, 2012, for right ankle pain following an injury six weeks earlier; she had been wearing a boot for the past two weeks. AR556. Examination revealed no significant swelling, guarded range of motion and tenderness to palpation. AR556. X-rays did not show anything obvious so an MRI was obtained and showed mild tendinopathy and tenosynovitis of the posterior tibialis and flexor digitorum lonjus tendons. AR556-58. She was continued in a boot with use of ice and anti-inflammatories. AR553-54. However, by October 29, 2012, she continued to have right ankle pain and physical therapy was planned. AR560.

### 7. Sanford Neurosurgery and Spine Center

Ms. Wellman was seen at the neurosurgery and spine center on August 21, 2012, for follow-up on her pseudotumor cerebri with lumbar peritoneal shunt inserted in 2003. AR492. She complained of severe headaches when laying down, associated visual difficulties, and ophthalmologic examination showed possible papilledema. AR492, 580-83 (July 26, 2012 eye exam), 584-86 (Aug. 12, 2012 eye exam). Surgery for a new shunt was planned and performed on August 31, 2012. AR592, 647.

Ms. Wellman was seen post shunt surgery on September 19, 2012, and her headaches had resolved but she was having swelling and a revision in the shunt was required due to mechanical complication. AR503-04, 640. Ms. Wellman was hospitalized and the shunt was surgically corrected on

September 24, 2012.  AR628-29.  She was seen again following repositioning of the peritoneal catheter on October 10, 2012, with no complications.  AR521.

Ms. Wellman was seen again on September 4, 2013, complaining of headaches.  AR543.  This followed a June 14, 2013, eye examination where Ms. Wellman again complained of increased spinal pressure and the eye doctor again found possible papilledema.  AR587-89.  MRIs of the brain, cervical spine and an x-ray shunt survey were all ordered on September 4, 2013.  AR542.

Ms. Wellman had similar headaches and spinal pressure and saw her eye doctor again on July 22, 2013[5], and this exam did not show possible papilledema, but she was again referred to Dr. Asfora.  AR590-92. Ms. Wellman did state in a medical history that she submitted that her headaches had returned and her neurosurgeon had referred her to a new neurologist that she was scheduled to see on December 9, 2013.  AR329.  She also stated she had accepted a part-time position at Premier Bankcard starting November 11, 2013.  AR329.

### 8.    Sanford Surgical Associates

Ms. Wellman had a prior lap band surgery in 2007 and was seen at Sanford Surgical Associates on a number of occasions due to related problems. AR434.  In January, 2012, she was seen to remove all the fluid from the band due to night time reflux, dysphagia, and chest pressure.  AR434.  She was seen again on October 15, 2013, with problems with food getting stuck, vomiting

---

[5] The Joint Statement of Material Facts lists the exam date as March 5, 2014. That was the date the examination record was printed.  The actual examination took place on July 22, 2013.  See AR590.

and choking. AR434. She reported continued nighttime heartburn and reflux/heartburn following meals. AR435. The band was evaluated, determined to be in the proper place and due to her symptoms it was attempted to remove any remaining fluid from the band. AR436. Ultimately, Ms. Wellman had the lap band surgically removed on October 24, 2013. AR449.

### 9. Craig A. Sauer, DC

Ms. Wellman received regular chiropractic treatment between July 12, 2012 and October 23, 2013, for headaches with neck and back pain. AR404-11. She also reported bilateral wrist and ankle pain. AR411. Treatment included spinal manipulation, trigger point therapy, muscle stretches, and traction. AR404-11. Ms. Wellman received treatment nine times in 2012 and 10 times in 2013, and reported headaches at most appointments. AR404-11.

### 10. State Agency Assessments

The state agency physical experts evaluated the file at the initial level on May 7, 2014, and again at the reconsideration level on August 4, 2014, and both times found that Ms. Wellman suffered no severe physical limitations but had migraines, other disorder of the nervous system, other infectious and parasitic disorder, and fracture of the lower extremity that were non-severe impairments, so no physical RFC was completed at either level. AR115, 145-46.

The state agency mental expert at the initial level found that Ms. Wellman had severe affective disorder, anxiety disorder and personality

26

disorder. AR116. The expert found that Ms. Wellman had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace and no repeated episodes of decompensation, each of extended duration. AR116. The expert found she was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without unreasonable breaks, interact with the public, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers. AR118-19. The medical expert concluded Ms. Wellman:

> [H]as some social anxiety and difficulty getting along with others. She would require an environment with reduced contact with others. She has the basic social skills necessary for superficial and brief interactions with co-workers and the public. While she indicates some difficulty with authority figures, she has held several jobs in the past and should be able to interact appropriately with supervisor if she is motivated to keep the job. She would be less distracted and less emotionally labile in a work setting where there is little to no contact with the public.

AR119.

The state agency mental expert at the reconsideration level made almost word for word identical findings. AR146-49. This medical expert concluded Ms. Wellman "has the residual mental demands to understand, follow and carry out three step instructions on a consistent basis, though given her hx [history] she would be capable for more complex instructions at times emotional lability tends to impact her being able to do so on a consistent basis.

Given interpersonal difficulties and social anxiety, it is best that she work within a work setting where social demands are limited." AR149.

**D.    Testimony at ALJ Hearing**

**1.    Ms. Wellman's Testimony**

Ms. Wellman testified she was a quality analyst at Meta Payment Systems from 2008 to 2013, and had a lot of absences, so she had obtained FMLA leave the last three years, and had used all of the 12 weeks of allowed absences, except for 7 hours the last year. AR81. Ms. Wellman explained that she used leave for missed days and times when she was late or had to leave early and the absences were due to headaches, allergy issues, and issues with depression and anxiety. AR81-82. She said by the end she was missing 6-8 days per month, and they could not talk to her about the absences until her protection from the FMLA leave was almost used up. AR93. Ms. Wellman testified the job ended after a meeting with the HR vice president who told her she was running out of FMLA protection and that she should consider that she may be disabled. AR85. The HR vice president told her she was not really doing her job because she was gone so much and her co-workers had to make up for her. AR85-86.

Ms. Wellman testified that she had allergy problems from co-workers who wore cologne quite a few times, which caused her throat to swell requiring the use of an Epipen. AR82, 91. She explained that since she had not been working and was at home, she was not exposed to things and her allergy issues had been better. AR91. She said she also had problems getting along with co-

workers; she was less tolerant and they would get on her nerves, and it bothered her when they were competitive or controlling or if they thought a person was not pulling their own weight. AR82.

Ms. Wellman testified that following the Meta Payment job she tried to work at Premier Bankcard in customer service part-time, but she only lasted two months because she had an extremely hard time dealing with people on the phone and would get upset easily and spent a lot of time in the bathroom trying to cope. AR86. She explained this was happening 7 to 10 times per shift and she gave up and quit. AR87.

Ms. Wellman testified that her pseudotumor cerebri was a condition where her spinal fluid is not absorbed properly resulting in pressure on her optic nerve and brain that causes medium to severe headaches and visual disturbances. AR88. She testified that it also presses on her front lobe which causes some of her anxiety and depression issues. AR88. She said the headaches occurred randomly, sometimes every day and other times one or two per week, and they lasted anywhere from an hour to a week, and when they are severe she gets nauseous. AR88.

Ms. Wellman testified that she had suffered from depression and anxiety for several years, but it became worse when her sister committed suicide four years earlier. AR89. She said she had treated with Dr. Bahnson for ten years or more, but had to switch to Southeastern for financial reasons. AR89. She testified that she sees a psychiatrist, caseworker, and started counseling a month earlier, all at Southeastern. AR90.

## 2.     Vocational Expert Testimony

The ALJ's first hypothetical question to the vocational expert ("VE") was as follows:

> Assume on initial hypothetical as the DDS did, do you have a person who could work at a medium – up to a medium level, somewhat reduced.  They'd be limited to lifting about 30 – 30 pounds occasionally, about 15 pounds or less frequently, sit six hours in an eight-hour workday, stand and walk six hours, no limits in reaching.  No postural limits, no limits in climbing stairs or ladders.  No manipulation limits, no visual limits with glasses.  No communication limits.  They would have to avoid any concentrations of dust, fumes, odors, gases, aerosols in the air, and poor ventilation.  They would at all time have at least mild limits on activities of daily living with some moderate limits in social functioning, some moderate limits in concentration, persistence and pace.  When I use the term mild, I mean slightly affected not interfering with work activity.  However, when I use the term moderate, I mean affected not precluded the person's performing, however, doing so at lower acceptable limits for most workplaces.  As defined, the person would be moderately limited in the ability to interact on a consistent basis with the public, and the ability to get along on a consistent basis with coworkers.  And then the ability to accept instruction with criticism from supervisors.  They would also have moderate limits in the ability to carry out detailed and complex instruction, and the ability to maintain extended concentration for those kinds of tasks.  And then the ability to adapt to significant changes in a work routine or setting.  Thus, we have a worker who's essentially more limited to jobs that involve brief and superficial types of contact with other[s].  While performing more simple routine repetitive types of tasks, probably in the area of about three – three steps, on average.

AR100-01.  The VE testified the individual would not be able to perform any of Ms. Wellman's past relevant work.  AR101.

The VE testified the hypothetical person could do the unskilled job of office helper, and telephone survey worker.  AR102.  The VE said these jobs were light exertion and Specific Vocational Preparation (SVP) of 2, and that his testimony was consistent with the Dictionary of Occupational Titles.  AR103.

The VE testified that an individual who had ongoing absences of 3-5 days per month would not be able to maintain any job.  AR104.

**E.    Other Evidence**

Ms. Wellman obtained and submitted letters to the Appeals Council from Cigna regarding her short-term disability while working at Meta Payment Systems dated June 20, 2013, to July 24, 2013.  AR68-74.  The letters documented her application and approval for short-term disability while working for Meta Payment Systems.  AR68-70.  The July 1, 2013, letter stated that the short-term disability was extended.  AR72.  The July 24, 2013, letter indicated that her claim had been denied as of July 24, 2013, and included a hand-written note dated August 5, 2013, showing her desk had been cleaned off and she could pick up her personal items.  AR74.

Ms. Wellman obtained and submitted letters to the Appeal Council from Meta Payment Systems dated June 12, 2013, and June 21, 2013, that showed all of her available FMLA leave except for 7 hours had been consumed by June 12, 2013.  The June 21, 2013, letter stated that all FMLA leave had been consumed and that her position was being filled.  AR66-67.

Ms. Wellman completed a function report in which she wrote, "lifting – 30 lbs – bending causes headaches kneeling causes headaches," and she could only walk 2-3 blocks before needing to rest for 5 minutes. AR305. Other family members did the household activities.  AR302-03.

**F.    Disputed Facts Proposed by the Plaintiff and Objected to by the Commissioner**

The ALJ discussed the medical evidence in evaluating Ms. Wheeler's[6] credibility, and he discussed her good work history, which he stated provides some positive probative weight in her allegations of disability, but the decision mentioned no other factors related to her credibility.  AR51-55.

The Appeals Council failed to consider the following evidence:

Letters from Ms. Wellman's short-term disability while working at Meta Bank, dated June 20, 2013, to July 24, 2013, with a hand-written note on the July 24, 2013, letter dated August 5, 2013, showing she was terminated.  AR68-74.

Letters from her employer regarding FMLA usage showing all available leave had been consumed, dated June 12, 2013, and June 21, 2013.  AR 65-67.

Medical records from Avera McGreevy-West clinic dated March 19, 2014, to October 6, 2015.

**G.    Issues on Appeal**

Ms. Wellman raises four issues in support of her request that the Commissioner be reversed:

The Commissioner erred by failing to consider new and material evidence.

The RFC formulated by the Commissioner is not supported by substantial evidence in the record.

The Commissioner failed to properly evaluate opinions of treating physicians.

There is not substantial evidence to support the Commissioner's decision that there were occupations Ms. Wellman could perform.

The Commissioner disagrees and asks this court to affirm its decision below.

---

[6] It is assumed this reference is to Ms. Wellman.

**DISCUSSION**

**A.    Standard of Review.**

When reviewing a denial of benefits, the court will uphold the
Commissioner's final decision if it is supported by substantial evidence on the
record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627
(8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla,
less than a preponderance, and that which a reasonable mind might accept as
adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>,
402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425
(8th Cir. 1975).  "This review is more than a search of the record for evidence
supporting the [Commissioner's] findings, and requires a scrutinizing analysis,
not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott
v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered,
citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts
from the Commissioner's decision must be considered, along with the evidence
supporting it. <u>Minor</u>, 574 F.3d at 627.   The Commissioner's decision may not
be reversed merely because substantial evidence would have supported an
opposite decision.  <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Woolf
v. Shalala</u> 3 F.3d 1210, 1213  (8th Cir. 1993).  If it is possible to draw two
inconsistent positions from the evidence and one of those positions represents
the Commissioner's findings, the Commissioner must be affirmed.  <u>Oberst v.
Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should

33

neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett 777 F.2d at 1320, n.2. This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's

RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.     Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.     Whether the Commissioner Erred By Not Considering New Evidence

Ms. Wellman argues the Commissioner erred in failing to review the new evidence she submitted after the ALJ issued its decision but before the Appeals

Council denied review. The Commissioner argues the decision by the Appeals Council denying review is not subject to judicial review.

The Eighth Circuit has used the term "perplexing" to describe the issue of how medical evidence submitted in the first instance to the Appeals Council should be evaluated by a reviewing court in an administrative appeal. Mackey v. Shalala, 47 F.3d 951, 951 (8th Cir. 1995). A reviewing court need not always consider post-hearing evidence. Id. at 952. First, the claimant must show the evidence to be "new" and "material" and relate to the period before the ALJ's decision.[7] Id. See also 20 C.F.R. § 404.970(b).

"New" evidence is, of course, evidence not previously in the record, but in order to be "new," the evidence also must not be merely cumulative of evidence that *is* already in the record. Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000).

The date on a medical record or opinion is not determinative of whether it is "material." Rather, regardless of the date the document was created, the question is: does it relate to conditions that existed in the period before the ALJ issued its decision? Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000); Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990). If the record

_____

[7] The Mackey court also required the claimant to show "good cause" for failing to introduce the evidence before the ALJ. Mackey, 47 F.3d at 952. However, in Mackey, the evidence was presented directly to the district court for the first time; it had never been presented to the ALJ or to the Appeals Council below. Id. at 951-52. For such circumstances, the "good cause" requirement applies. Id. However, where the claimant presented the new evidence to the Appeals Council after the ALJ hearing, "good cause" is not required when judicial review of the agency's decision is conducted. See Box v. Shalala, 52 F.3d 168, 171 n.4 (8th Cir. 1995).

addresses a condition which came about after the ALJ hearing, or addresses a post-hearing deterioration of a pre-existing condition, it is not material; if it addresses a condition which existed prior to the ALJ hearing, it is material. Bergmann, 207 F.3d at 1069-70; Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).

The Commissioner is technically right—a reviewing court does not consider whether the Appeals Council "erred" in failing to grant review—nor can a court *order* the Council to review the ALJ decision. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). The grant of jurisdiction to the courts to review the Commissioner's "final decision" to deny benefits does not confer jurisdiction to review the "Appeals Council's non-final administrative decision to deny review." Id. If the Appeals Council considered the new evidence and declined to grant review, the district court does not evaluate the Appeals Council's decision not to review. Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

Rather, when the Appeals Council declines review, the ALJ's decision becomes the final decision of the Commissioner. Mackey, 47 F.3d at 952. Even if the Appeals Council denies review, the evidence submitted to it becomes part of the administrative record. Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992). If the Appeals Council refused to consider the new evidence, a reviewing court may remand to the Appeals Council if the evidence is both new and material. Nelson, 966 F.2d at 366.

If the Appeals Council considered the new evidence but nonetheless declined to review, then the task for the reviewing court is then to consider whether the ALJ's decision is supported by substantial evidence in the record as a whole, *including* the new evidence that was not before the ALJ. Cunningham, 222 F.3d at 500; Mackey, 47 F.3d at 952; Riley, 18 F.3d at 622; Nelson, 966 F.2d at 366; Browning, 958 F.2d at 822-23.  To an extent, this requires the court to speculate as to "how the administrative law judge would have weighed the newly submitted reports if they had been available in the original hearing." Riley, 18 F.3d at 622.  In this regard, the Eighth Circuit's approach differs from that of other circuits, notably the Seventh and Sixth Circuits, which simply refuse to consider tardy evidence in considering a claimant's appeal.  Mackey, 47 F.3d at 952.

### 1.    Did the Appeals Council Consider the Evidence?

Ms. Wellman submitted eight groups of documents to the Appeals Council after the ALJ rendered its unfavorable decision.  She alleges the Appeals Council considered some documents, but failed to consider the following documents:

> Letters from Ms. Wellman's short-term disability while working at Meta Bank, dated June 20, 2013, to July 24, 2013, with a hand-written note on the July 24, 2013, letter dated August 5, 2013, showing she was terminated.  AR68-74.

> Letters from her employer regarding FMLA usage showing all available leave had been consumed, dated June 12, 2013, and June 21, 2013.  AR 65-67.

> Medical records from Avera McGreevy-West clinic dated March 19, 2014, to October 6, 2015.

The Appeals Council stated it reviewed additional evidence which it was making part of the record. AR2, 6. The additional evidence the Appeals Council stated it had reviewed was: (1) SEBH records from April 21, 2014, to September 17, 2015; (2) SEBH records from September 29, 2015, to January 9, 2016; (3) records from Anna [sic] McGeevy [sic] West Clinic, dated October 6, 2015, to January 9, 2016. Id. As to the evidence listed, the Appeals Council stated that the treatment reflected in the records all post-dated the hearing before the ALJ, so it would not consider this evidence. AR2.

Ms. Wellman argues the Appeals Council did not consider the Avera McGreevy-West records because the Council used the wrong name and wrong dates to describe the records. This is a red herring. It is obvious the Appeals Council *did* consider the records from *Avera* McGreevy-West. The documents themselves reflect the correct name of the medical care provider—"Avera." AR14-17. The Appeals Council's use of the word "Anna" is merely a typographical or transcription error.

As to the dates, the records reflect that they are a "patient summary report." AR14-17. The date the Avera employee *ran* the report was January 9, 2016, a date that is printed prominently at the top of the document. AR14. Thus, the Appeals Council appears to have merely taken note of the wrong date from the document. Nevertheless, it is clear the Appeals Council *did* consider the actual records submitted by Ms. Wellman from Avera McGreevy-West.

There is no mention in the decision by the Appeals Council of the letters from Ms. Wellman former employer(s). AR1-7. Therefore, the court assumes

the Appeals Council did not consider this evidence at all.  Therefore, the court may remand to the Commissioner to consider the letters if they are new, material, and relate to a condition that predated the ALJ's decision.  <u>Nelson</u>, 966 F.2d at 366.

### 2. Was the Evidence Ms. Wellman Alleges the Appeals Council Did Not Consider New, Material, and Related to a Pre-existing Condition?

#### a. Letters from Former Employer

The letters at issue were created between June 12, 2013, and August 5, 2013.  AR65-74.  They document that Ms. Wellman first used up all 12 weeks of her Family and Medical Leave Act ("FMLA") allowance at MetaBank, then applied for and received short-term disability, and was ultimately terminated by MetaBank on August 5, 2013, for lack of attendance.  <u>Id.</u>  The ALJ hearing was held on August 25, 2015, two years *after* these documents were created. Therefore, they are not "new."  <u>Thomas</u>, 928 F.2d at 260.

Ms. Wellman argues that she was entitled to have the ALJ credit her testimony about her use of FMLA leave while employed at MetaBank.  When, after the ALJ issued his decision, it became apparent the ALJ did not fully credit Ms. Wellman's testimony, she saw the need to submit the documents in question.  Nearly this precise situation arose in the <u>Thomas</u> decision.

In <u>Thomas</u>, after receiving an adverse decision from the ALJ following his hearing, Thomas sought to introduce additional hospital and doctors' records that predated the hearing concerning his conditions.  <u>Id.</u>  His explanation for not introducing the documents into the record *before* the ALJ hearing was that

41

he thought he was entitled to have the ALJ give substantial weight to his treating physician's opinion.  Id.  When the ALJ failed to do so, that prompted Thomas to submit the records post-hearing.  Id.  The Eighth Circuit rejected the rationale, saying, "[f]or whatever reason, Thomas felt these additional records were unnecessary to prove his point; his miscalculation in this regard does not supply good cause for failing to introduce these records in the first instance."  Id.

Although the Thomas passage quoted is evaluating the good cause standard, it applies equally to the evaluation of whether the evidence is "new." Here, it is not new.  Ms. Wellman was the recipient of the two letters from MetaBank and the applicant on the short-term disability policy.  She clearly knew of the existence of these documents.  Her miscalculation about the need to submit these documents into the record at or prior to the ALJ hearing does not render the documents "new evidence."  Id.  See also Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012) (MRI submitted after the ALJ's adverse decision was not new evidence because the record was in existence two years before the ALJ hearing).

Furthermore, the court notes that the fact Ms. Wellman had used up all but 7 hours of her FMLA leave by mid-June, 2013, is documented numerous times in the record, quite apart from her oral testimony at the ALJ hearing. See, e.g. AR698, 706-07.  Therefore, the post-hearing letter from MetaBank to this effect is merely cumulative of other evidence already in the record.

An aside is appropriate here. The Commissioner argues that when a claimant is represented by legal counsel the ALJ is relieved of his duty to develop the record and can rely on counsel's presentation of the case. See Docket No. 14 at p. 6 (citing Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994)). Thus, argues the Commissioner, the fact that Ms. Wellman was represented at the hearing by counsel now precludes her from asking for a remand so the Commissioner can consider new evidence.

Of course, that is *not* the law and that is *not* what the Clark court held. In Clark, the claimant was *un*represented at the ALJ hearing and later, on appeal, she argued the ALJ failed to fully develop the record. Id. The court held "the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." Id. Relieving the ALJ of an obligation to *advocate* as claimant's counsel in the absence of legal representation does *not* equate, as the Commissioner seems to suggest, to allowing an ALJ to sit on his hands when a claimant *is* represented by counsel.

In fact, the duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in social security cases and it is just the opposite of what the Commissioner asserts in her brief:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial. Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant

at the administrative hearing. The ALJ possesses no interest in
denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted). See also

Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to

develop the record even when claimant has counsel). Here, had the absence of

the FMLA and short-term disability documents been pivotal and obviously

missing from the record, this court would not hesitate to hold the ALJ to his

duty to develop the record and obtain the documents in question.

However, aside from the fact that the records are not new and are merely

cumulative, they would not have impacted the ALJ's decision. The ALJ did not

specifically discredit Ms. Wellman's testimony regarding her employment at

MetaBank. Rather, the ALJ noted that Ms. Wellman left MetaBank at about

the same time she experienced a psychiatric hospitalization in mid-June,

2013—the clear inference from the ALJ's decision is that her mental conditions

played a distinct role in the termination of her employment. AR52. The ALJ

also recited that Ms. Wellman had had some absences at work prior to her

leaving. Id.

Finally, the court notes that the letters in question, AR65-74, concern a

period of time four months *before* Ms. Wellman's application for disability

benefits and the alleged onset date of her disability. The letters are like the

collateral source rule: counsel is seeking to introduce documents to shore up

testimony that was somewhat of a collateral matter in the first place. They are

cumulative to boot. The court finds the letters and documents concerning

FMLA and short-term disability benefits are not new evidence requiring remand

44

to the Commissioner.  The court considers them, however, together with the other evidence in the record to determine whether the ALJ's decision is supported by substantial evidence.

### b.     SEBH and Avera-McGreevy West Records

These records were specifically cited by the Appeals Council as records they considered.  AR2.  The Avera-McGreevy records are found at AR14-17.  The SEBH records are found at AR19-42.

### i.     Avera-McGreevy Records

First, the court clears up some confusion as to these records.  Counsel for Ms. Wellman submitted these records to the Appeals Council post-hearing.  The cover letter from counsel is dated January 26, 2016.  AR8.  Counsel's letter references records from Avera McGreevy-West dated "March 19, 2014, to October 6, 2015."  Id.  Those same date ranges are referenced in counsel's brief to this court.  See Docket No. 13 at p. 5.  However, the records actually received by the Appeals Council and inserted into the record do not match these dates.

There are only two records from Avera-McGreevy in the administrative record post-hearing.  They are a three-page patient summary report.  AR14-16.  And a single treatment record from October 6, 2015.  AR17.  If counsel intended to submit other additional records from Avera-McGreevy to the Appeals Council, a mistake was made and those records were not submitted.  No records bearing the dates indicated in counsel's cover letter are in the administrative record.

The Avera-McGreevy treatment record documents that on October 6, 2015, Ms. Wellman obtained a refill prescription for Ms. Wellman for levothyroxine, a drug used to treat under-active thyroid. AR17. The patient summary report details all of Ms. Wellman's diagnoses, immunizations, medications, and allergies from the year 2011 to January, 2016. AR14-16.

### ii.     SEBH Records

The SEBH records document the following activities. On September 29, 2015, Ms. Wellman canceled a scheduled counseling session, saying she was not feeling well. AR19.

On October 5, 2015, Ms. Wellman saw Dr. Stevermer for medication management. AR20-22. Ms. Wellman stated she had been doing "pretty good," but had gone through some "rough times" since the last time she saw the doctor. AR 21. She and her mother moved from the house they had been sharing with Ms. Wellman's father because the father had been caught molesting her niece. Id. Ms. Wellman reported her father also molested her as a child. Id. She stated her medications were working "very well" for her, her anxiety had improved, she was dealing with her anxiety much better, and her concentration had been "better." Id. She wanted to continue on her current medication. Id. She described her sleep as "good," her interest in things she likes to do had been "improving," and her appetite was improving. Id. She had started to contact friends and family to do things. Id.

On October 5, 2015, Ms. Wellman skipped a scheduled counseling session because she finished her doctor's appointment early and did not want

to wait another 10 minutes.  AR23.  On October 13, 2015, Ms. Wellman canceled a scheduled counseling session, saying she felt ill.  AR24.  On October 14, 2015, SEBH called Ms. Wellman and left a voice mail message to reschedule her canceled appointment.  AR25.

On October 20, 2015, Ms. Wellman had a counseling session at the SEBH offices in response to a telephone call the day before asking her to set up an appointment.  AR26, 27.  She had a depressed mood and clear thought process.  AR27.  She described being "okay" until yesterday when she found out her disability application had been denied.  Id.

On October 26, 2015, Ms. Wellman had a counseling session in her home.  AR28.  They discussed Ms. Wellman's recent doctor's appointment and that there were no medication changes.  Id.  Ms. Wellman reported taking her medications as prescribed without having any issues.  Id.  On November 3, 2015, Ms. Wellman canceled a counseling session scheduled for that day saying she did not feel well.  AR29.

On November 17, 2015, Ms. Wellman attended a counseling session at SEBH.  AR30.  Ms. Wellman's mood was neutral and her thought process clear.  Id.  She expressed frustration with her mom about an upcoming party.  Id.  The counselor encouraged Ms. Wellman to be more regular with her counseling appointments.  Id.  Ms. Wellman admitted she often finds reasons not to leave her house.  Id.

On November 23, 2015, Ms. Wellman canceled her counseling session, stating she did not feel well.  AR31.  On December 2, 2015, Ms. Wellman

canceled a counseling appointment, stating her anxiety was too high to come to the session.  AR32.  On December 9, 2015, Ms. Wellman canceled a scheduled counseling session and stated she would contact the counselor to reschedule.  AR33.  On December 18, 2015, SEBH called Ms. Wellman to attempt to set up a counseling appointment and left a voice message.  AR34.

Ms. Wellman had a counseling session at SEBH on December 21, 2015.  AR35.  Ms. Wellman was described as having a "bright mood and clear thought process."  Id.  Nonetheless, Ms. Wellman described her anxiety as "high," rating her anxiety at a 6-7 out of a maximum of 10 points.  Id.  The counselor reminded Ms. Wellman that she does better when she attends counseling sessions regularly and recommended that Ms. Wellman resume weekly sessions.  Id.

Ms. Wellman's therapist at SEBH called her December 31, 2015, to set up an appointment.  AR36.  He left a voice mail message, but Ms. Wellman did not answer.  Id.  The SEBH records document that Ms. Wellman had a counseling session on January 6, 2016.  AR37.  She texted the therapist and canceled the appointment without asking to reschedule.  Id.

A counseling visit with Ms. Wellman was conducted at her home on January 7, 2016.  AR38.  Ms. Wellman talked about her social anxiety and said she only left her apartment about once a week to do grocery shopping.  Id.  When the therapist asked Ms. Wellman about her religion, Ms. Wellman became excited to tell the therapist about her beliefs.  Id.

Ms. Wellman had a medication management visit with Dr. Stevermer on January 11, 2016. AR 39-42. Ms. Wellman told Dr. Stevermer that she had been doing "okay" but she was experiencing social anxiety that kept her from leaving her house for up to two weeks at a time. Id. She was living with her mother at the time. Id. She felt her mirtazapine medication was causing her to have increased appetite and increased restless leg syndrome, which made it difficult for her to fall asleep at night. Id. Dr. Stevermer decided to increase Ms. Wellman's Risperdal to 1.5 mg. and discontinue the mirtazapine. Id. Dr. Stevermer told Ms. Wellman he wanted to see her again in two or three months' time. Id.

### iii. Analysis of Avera-McGreevy and SEBH Records

For the above evidence to be "new," it must be more than merely cumulative of other evidence in the record. Bergmann, 207 F.3d at 1069. In addition, it must relate to Ms. Wellman's condition for the time period for which benefits were denied (October 7, 2013, to September 23, 2015), and "must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition." Id. at 1069-70.

In Bergmann, although the new records related to Bergmann's long-standing diagnosis of depression/dysthymia remained the same, there was more specific and conclusive information in the new records—namely that Bergmann had not had any social contact for 7 months, had no involvement in any activities outside her home, had not been able to do any household activities such as cooking and cleaning for 3 weeks, and would probably not

improve in the next 12 months.  Id. at 1070.  This, the Eighth Circuit held, constituted new and material evidence.  Id.  The Eighth Circuit held the information involved a steady deterioration of Bergmann's condition, but documented that the deterioration had begun *before* the ALJ hearing.  Id.

In Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007), the Eighth Circuit held the records claimant submitted after the ALJ hearing were not new and material because they described her condition as it existed at the time the records were written—i.e. post-hearing.  Thus, they did not relate to "claimant's condition for the time period for which benefits were denied."  Id.

In Eidoen v. Apfel, 221 F.3d 1342, 2000 WL 816243 at *1 (8th Cir. 2000) (table), the court held certain mental health records were not new and material. Although the claimant had had depressive symptoms for over a decade, her post-hearing reports of suicidal thoughts, plans, and anxiety attacks were new. Id.  Thus, the court held, these records did not relate to the claimant's condition for the period for which benefits were denied.  Id.

In Geigle v. Sullivan, 961 F.2d 1395, 1397 (8th Cir. 1992), an MRI conducted post-hearing was both new and material because it provided medically objective support for the claimant's subjective complaints of headaches and related impairments.  The evidence was not considered a post-hearing deterioration in the claimant's condition because she had been seeking medical help for three years to address these symptoms.  Id.  The court held the MRI merely documented and provided objective evidence for what the claimant's condition had been all along.  Id.

The court finds although the Avera-McGreevy and SEBH records are "new" in the sense that they were not in existence at the time of the ALJ hearing, they are merely cumulative of other evidence in the record. The fact that Ms. Wellman had periods of time when her anxiety kept her home-bound for lengthy intervals was documented several times in the record. AR572-73, 742, 744, 749-50. Nor were these earlier periods of self-isolation different in kind or degree from that evidenced in the post-hearing documents. There were times pre-hearing where Ms. Wellman described going outside her home only once per week. Id. This distinguishes Ms. Wellman's case from the Bergmann case where the claimant had not had social contact for 7 months and such a lengthy period of isolation was otherwise not documented in the records pre-hearing.

Also documented in the pre-hearing records in this case were Ms. Wellman's complete lists of diagnoses, allergies, and medications. See, e.g. AR343-44, 562-64, 664-66, 724, 728-29, 741-43. Finally, the pre-hearing records documented in several places that Ms. Wellman's father had sexually molested her as a child. AR665, 668, 698, 745. While this information is tragic and no doubt contributed to Ms. Wellman's anxiety and depression as an adult, the information was well documented in pre-hearing records.

In short, there is no information about Ms. Wellman's conditions, functioning, or the severity of these issues in the post-hearing documents that is not also contained in the pre-hearing record. The court concludes the post-hearing documents were not new. Therefore, to the extent the Commissioner

refused to consider these documents, remand to require the Commissioner to consider the documents is not warranted. However, the court will consider all post-hearing documents submitted to the Appeals Council, together with the evidence in the record as a whole, to determine whether the ALJ's decision is supported by substantial evidence. Cunningham, 222 F.3d at 500; Mackey, 47 F.3d at 952; Riley, 18 F.3d at 622; Nelson, 966 F.2d at 366; Browning, 958 F.2d at 822-83.

## E.    Did the ALJ Properly Determine Ms. Wellman's RFC?

Ms. Wellman argues the ALJ's determination of her physical RFC was in error. She also argues that the ALJ applied the wrong legal standard when determining her RFC. The Commissioner asserts the ALJ's determination of Ms. Wellman's RFC is supported by substantial evidence.

### 1.    The Law Applicable to Determination of RFC

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[8] Lauer, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory

_____

[8] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th

Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

## 2.    Ms. Wellman's Physical RFC

The ALJ found Ms. Wellman had the following severe physical impairments:  pseudo-tumor cerebri, status post VP shunt placement with revision; asthma; and obesity.[9]  AR48.  The ALJ recognized Ms. Wellman had diagnoses for these conditions, that they more than minimally limited her ability for basic work activity for the requisite duration of twelve months or more.  Id.  The ALJ also recognized Ms. Wellman suffered from a chip fracture of her tibia and a chronic thickening of her anterior talo-fibular ligament.  Id.  However, the ALJ did not consider this impairment to be severe because there were no records for the disability period indicating she continued to suffer symptoms; records regarding her ankle from 2012 indicate she felt much better after receiving inserts.  Id.

The ALJ then opined Ms. Wellman had the RFC to perform light to medium work as follows:

> She can lift and carry 30 pounds occasionally and 15 pounds or less frequently.  She can sit a total of 6 hours, as well as stand and walk, combined, a total of 6 hours in an 8-hour workday.  She has no limits in reaching.  She has no postural limits and no limits in

---

[9] The ALJ also found she had the following severe mental impairments: affective disorder; anxiety disorder; and personality disorder.  AR48. Ms. Wellman does not take issue with the ALJ's assessment of her mental disorders in this appeal except as to the weight to be given her treating physicians' opinions.

climbing stairs or ladders. She has no manipulation limits, no visual limits with glasses, and no communication limits. She must avoid any concentrations of dusts, fumes, odors, gases, aerosols in the air, and poor ventilation. Due to non-exertional mental limitations, as discussed, *supra*, she is essentially limited to jobs involving only brief and superficial contact with others while performing simple, routine and repetitive types of tasks of about three steps on average.

AR50.

Ms. Wellman does not take issue with the physical RFC in the sense that she disputes she is able to lift and carry 30 pounds occasionally or that she cannot sit for 6 hours a day. Rather, Ms. Wellman questions the ALJ's basis for her physical RFC. The only medical source opinions in the record concerning physical RFC were from the state agency physicians. Ms. Wellman argues the ALJ rejected the opinions of the state agency physicians. Therefore, without those opinions, Ms. Wellman argues there is no basis for the ALJ's determination of her physical RFC.

The ALJ did address his physical RFC in the narrative of his opinion. For example, he discussed Ms. Wellman's function report which she completed on February 25, 2014. AR51-52 (discussing AR300-07). In that function report, Ms. Wellman herself stated she had no problems squatting, standing, reaching, walking, sitting, talking, hearing, climbing stairs, or using her hands. AR305. She stated that she could lift up to 30 pounds.[10] AR305. She stated

_____

[10] Ms. Wellman seems to interpret her function statement to say that lifting 30 pounds causes headaches. That is not how the court interprets her handwritten statement. Above on the function questionnaire, she had checked "lifting" as an activity affected by her impairments. AR305. She also checked "bending" and "kneeling." Id. Below, she was asked to explain each item checked. Id. She wrote in explanation: "lifting—30 lbs—Bending causes

56

she did her own laundry, but needed help carrying the loads of laundry. AR302. She stated she could walk 2 to 3 blocks before needing to rest; after resting 5 minutes she would be able to resume walking. AR305. The only physical acts she indicated she had trouble with were bending and kneeling, which she said would cause headaches. AR 302-03, 305. However, at the hearing before the ALJ when she was describing her headaches, Ms. Wellman testified that there was nothing she did or did not do that would cause her to have headaches. AR88.

The ALJ considered Ms. Wellman's obesity and concluded it was a severe impairment because it more than minimally interfered with her basic work activities.[11] AR51-52. He noted her weight and height, despite some variation in weight, consistently placed her in a BMI[12] category above 40. Id. Nevertheless, the ALJ held Ms. Wellman's obesity was not incongruent with the RFC he had determined. Id.

Ms. Wellman never asserted her obesity as an impairment. AR232, 234, 243, 271, 310, 312, & 319. The Commissioner considers obesity to be a medically determinable impairment the effects of which ALJs are to consider when evaluating disability. See SSR 02-1p. Although there is no listing in the Social Security regulations for obesity, ALJs should consider the effect of

---

headaches. Kneeling causes headaches." Id. The court interprets this handwritten section to indicate her ability to lift is limited to up to 30 pounds. Also, that bending and kneeling cause headaches.

[11] Ms. Wellman had lap band surgery in 2007, but the lap band had to be removed in October, 2013, due to complications.

[12] Body mass index, a leading indicator of whether one is obese.

obesity in causing or contributing to musculoskeletal, respiratory, and cardiovascular impairments.  Id.  Even if obesity is a severe impairment, it may or may not hinder a claimant's RFC.  Id.

The ALJ noted that the record showed Ms. Wellman to have "ongoing good functioning from a physical standpoint."  AR52.  He noted that Ms. Wellman sought chiropractic care in 2012 and 2013, but that she had not seen a chiropractor after October, 2013.  Id.  The date of Ms. Wellman's alleged onset of disability was October 7, 2013, so no chiropractic care occurred during the period for which the ALJ was assessing Ms. Wellman's disability. The chiropractic records themselves showed Ms. Wellman reported improvement in her reported muscular and joint pain after receiving chiropractic care.  Id.

The ALJ stated the record showed "generally intact physical functioning" for the period of alleged disability.  Id.  Ms. Wellman's wellness exam by her treating physician on March 18, 2014, revealed no issues or findings physically, only psychiatric issues.  Id.

In addition to these documents, the ALJ considered Dr. Smith's pulmonary function assessment.  AR52.  However, Dr. Smith's opinion centered on nonexertional impairment resulting from Ms. Wellman's asthma, allergies and sensitivity to fumes, smoke, perfume and the like.  AR831-33. Dr. Smith offered no opinion that Ms. Wellman's respiratory conditions posed any limitations on her physical RFC.  Id.  He also did not indicate her obesity posed any limitations on her respiratory system.  Id.

The ALJ did not specifically discuss Ms. Wellman's pseudo-tumor cerebri condition and whether that condition had an impact on Ms. Wellman's physical RFC. However, Ms. Wellman addressed her physical RFC from *all* of her impairments in her function questionnaire and did not identify any physical limitations imposed specifically by that condition. Furthermore, when Ms. Wellman testified at the ALJ hearing, the primary symptom she attributed to her pseudo-tumor cerebri was headaches.[13]  AR88.  The ALJ did specifically discuss headaches and the fact that there were no medical records during the period of disability to verify that Ms. Wellman had any headaches, complained of any headaches, or sought medical care for headaches during that time.[14]

The ALJ in his opinion also discussed the state agency medical source statements.  AR52.  None of the state agency medical sources found Ms. Wellman to have any severe physical impairments.  AR107-21, 123-37, 139-51, 153-65.  They considered Ms. Wellman's headaches and ankle pain conditions, but concluded they were not severe impairments and did not hinder her functioning.  Id.

---

[13] Ms. Wellman also testified that the pseudo-tumor cerebri caused pressure on the front lobe of her brain, contributing to her anxiety and depression.  AR88. As discussed *supra* at footnote 9, Ms. Wellman does not take issue with the ALJ's assessment of her mental RFC in this appeal except as to the weight to be given her treating physicians' opinions.

[14] In a narrative statement Ms. Wellman submitted to the Commissioner in December, 2013, Ms. Wellman gave an exceedingly detailed medical history of herself from birth to that date.  AR326-29.  The last mention Ms. Wellman makes of having headaches in that detailed narrative is September, 2013, prior to the period of disability under consideration.

As to the headaches, although the record showed Ms. Wellman complained of headaches when her cerebral shunt needed to be revised in 2012, and again in June and September of 2013, the record for the period of disability being considered (October 7, 2013, to August 25, 2015), did not reveal any other complaints of headaches. Id.

Ms. Wellman did receive chiropractic care for muscular, joint, and headache pain, but that chiropractic care ended in October, 2013. Id. Again, the state agency physicians found no medical records showing further complaints of headaches, muscular or joint pain during the period of disability. Id.

Finally, the state agency physicians considered Ms. Wellman's tibia chip fracture. Id. This issue, too, was resolved outside the disability period with the last medical record regarding trouble or pain with Ms. Wellman's ankle dated 2012. Id. Ms. Wellman's medical records for the disability period under consideration contained no references to any complaints she made about her ankle. Id.

Ms. Wellman argues the state agency physicians did not conduct a RFC assessment. They did, however, discuss Ms. Wellman's own assessment of her capacity to function, partially adopting her own assessment. AR114, 130-31. Although the state agency physicians found Ms. Wellman's statement that she had trouble lifting *more than* 30 pounds to lack credibility and support in the record (AR117, 133), the ALJ *did* adopt Ms. Wellman's own statement of her

functional ability by concluding she could occasionally lift *up to* 30 pounds. AR50. This is no more than Ms. Wellman herself said she could lift. AR305.

The state agency physicians also doubted Ms. Wellman's statement that she had to rest for 5 minutes after walking 3 blocks. AR 117, 133. However, the jobs the ALJ determined Ms. Wellman could perform did not include any significant walking, so this is a moot issue.

The chief difference between the state agency physicians' opinions about Ms. Wellman's physical impairments and the ALJ's opinion centered on Ms. Wellman's obesity: the ALJ considered this impairment and the state agency physicians did not. The state agency physicians can hardly be blamed for failing to consider whether obesity was a severe impairment since Ms. Wellman never alleged obesity to be an impairment. The ALJ considered the impairment, found it to be severe, but found that it did not interfere with a RFC to do light to medium work. AR51-52.

The ALJ satisfied the requirement that he fully explain his determination of Ms. Wellman's physical RFC. The medical records from Ms. Wellman's physicians for the period of alleged disability under consideration simply did not contain any references to physical limitations in Ms. Wellman posed by her headaches, her ankle, general musculoskeletal or joint pain, or her respiratory impairments. Ms. Wellman herself did not assert any physical limitations, other than kneeling and bending. AR303-05. The state agency physicians were the only medical sources who opined about Ms. Wellman's physical RFC. AR107-21, 123-37, 139-51, 153-65. Their opinions provide the necessary

61

quantum of medical evidence to support the ALJ's determination of Ms. Wellman's physical RFC. This is true notwithstanding the fact the state agency physicians did not consider Ms. Wellman's obesity. They were not asked to consider obesity as an impairment. Ms. Wellman did not assert her obesity as an impairment.

"Where there is no allegation of a physical . . . limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

Here, the court finds the ALJ satisfied his duty both to develop the record and to explain how he arrived at his RFC. There were no allegations of physical limitations of a specific functional capacity other than a limitation in lifting (up to 30 pounds) and a limitation in kneeling and bending.[15] And there was no information in the case record of such a limitation or restriction during the period of disability under consideration. The ALJ then executed his duty to develop the record by requesting two state agency medical opinions as to Ms. Wellman's physical RFC. AR107-21, 123-37, 139-51, 153-65.

The court recommends affirming the ALJ's determination of Ms. Wellman's physical RFC because it is supported by substantial evidence in

---

[15] As discussed more fully below, the two jobs the ALJ ultimately concluded Ms. Wellman could do did not require functional exertion above these limits.

the record.  Further, the ALJ's narrative adequately explains how he determined the physical RFC by discussing Ms. Wellman's function questionnaire, the state agency opinions, other medical evidence in the record concerning physical impairments, and Dr. Smith's pulmonary RFC.

### 3.    The Legal Standard in Assessing RFC

Ms. Wellman asserts the ALJ applied the wrong legal standard in assessing her RFC.  The standard for assessing whether an impairment is "severe" or not has a durational requirement:  is the condition expected to last for a continuous period of 12 months or more?  20 C.F.R. § 404.1509.  The RFC determination, on the other hand, requires the ALJ to determine what level of functioning the claimant has on a regular and continuing basis in a full-time job or an equivalent work schedule.  SSR 96-8p.  In determining Ms. Wellman's RFC, she asserts the ALJ confused these two standards by requiring her to show her RFC was not at the level the ALJ determined for "any full and continuous 12-month period."  AR54.

The full context of the ALJ's statement was as follows.  He had been discussing Ms. Wellman's mental impairments and, in particular, her January, 17-21, 2014, psychiatric hospitalization and its proximation to her application for Social Security disability benefits (January 22, 2014).  AR53-54.  The ALJ noted that Ms. Wellman's overall mental condition had waxed and waned during the period of alleged disability.  AR54.  He then stated, "[h]owever, overall evidence reflects that she has typically done reasonably well from a mental standpoint.  The undersigned notes that evidence does not support a

finding that she experienced any full and continuous 12-month period when her ability to function fell below the above RFC [determined by the ALJ]." Id. The ALJ also wrote: "evidence does not support a finding that she experienced any full and continuous 12-month period from either the July 2013 ending of her employment at Metabank [sic] or from her October 2013 alleged onset date when her functioning fell below that identified in her above mental RFC." Id.

In its brief before this court, the Commissioner does not address the legal-standard issue raised by Ms. Wellman. Instead, the Commissioner simply argues that various evidence in the record supports the ALJ's determination of RFC. See Docket No. 14 at pp. 13-15.

The court agrees with Ms. Wellman. The ALJ himself *properly* applied the 12-month durational requirement at Step Two of his analysis when he found Ms. Wellman's impairments to be severe both because they had lasted for 12 months or more and because they more than minimally limited her ability for basic work activity. AR48. There is no 12-month durational requirement in determining RFC. SSR 96-8p. Instead, the inquiry is: what is the maximum level of functioning a claimant can sustain in a full-time job in the competitive, stressful world of work? Reed, 399 F.3d at 923; SSR 96-8p.

It is well-established that mental impairments can wax and wane. Nowling v. Colvin, 813 F.3d 1110, 1123 (8th Cir. 2016); Dillon v. Colvin, 210 F. Supp. 3d 1198, 1209 (D.S.D. 2016). A claimant may experience periods of improvement where they are apparently healthy, while at other times experience debilitating effects from their impairments. Dillon, 210 F. Supp. 3d

64

at 1209.  Especially if a claimant's improvement coincides with her being in a highly structured environment, such improvement is not indicative of not being disabled.  Nowling, 813 F.3d at 1123 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1200F ("If your symptomatology is controlled or attenuated by psychosocial factors, *we must consider* your ability to function outside your highly structured settings.") (emphasis added by Nowling court).  Imposing a 12-month durational requirement on RFC is not only the wrong legal standard, it flies in the face of what the Commissioner recognizes in its regulations to be the nature of mental impairments.

The ALJ applied the wrong legal standard in determining Ms. Wellman's RFC by imposing a 12-month durational requirement.  This requires remand for the ALJ to properly consider the record evidence and apply the correct legal standard to that evidence by answering the question:  What is the maximum functional capacity Ms. Wellman can exhibit in the stressful, competitive environment of a full-time job rather than the protected environment of her home where she leaves once per week?

**F.      Did the ALJ Improperly Evaluate Opinions of Treating Physicians?**

**1.      Standard for Evaluating Treating Physicians' Opinions**

Ms. Wellman asserts the ALJ failed to properly evaluate the opinions of two of her treating physicians:  Dr. Michalene Stevermer and Dr. R. Maclean Smith.  The Commissioner asserts the ALJ properly evaluated the opinions of these two medical sources.

Medical opinions from acceptable medical sources are considered evidence which the ALJ will consider, along with all relevant record evidence, in determining whether a claimant has an impairment, the nature and severity of the impairment, and the claimant's RFC.  See 20 C.F.R. § 404.1527(a)(2).  All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined the claimant;
>
> --whether the person giving the medical opinion treated the claimant;
>
> --the length of the treating relationship;
>
> --the frequency of examinations performed;
>
> --whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;
>
> --the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;
>
> --whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and
>
> --whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

The Commissioner will give controlling weight to the opinion of a treating source as to the nature and severity of a claimant's impairment if (1) the

opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) the opinion is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); Nowling, 813 F.3d at 1122. "A treating physician's opinion, however, 'does not automatically control or obviate the need to evaluate the record as a whole.'" Nowling, 813 F.3d at 1122-23 (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). If the opinion of the treating physician is inconsistent, or if other medical evaluations are "supported by better or more thorough medical evidence" the ALJ may be entitled to discount or even disregard a treating physician's opinion. Nowling, 813 F.3d at 1123; House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007); Wagner v. Astrue, 499 F.3d 842, 853-854 (8th Cir. 2007); Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical

opinion.  <u>Wagner</u>, 499 F.3d at 849; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016

(8th Cir. 2004) (citing <u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999)).

However, where opinions of non-examining, consulting physicians along with

other evidence in the record form the basis for the ALJ's RFC determination,

such a conclusion may be supported by substantial evidence.  <u>Harvey</u>, 368

F.3d at 1016.  Also, where a nontreating physician's opinion is supported by

better or more thorough medical evidence, the ALJ may credit that evaluation

over a treating physician's evaluation.  <u>Flynn v. Astrue</u>, 513 F.3d 788, 793 (8th

Cir. 2008)(citing <u>Casey v. Astrue</u>, 503 F.3d 687, 691-692 (8th Cir. 2007)).

Certain ultimate issues are reserved for the Agency's determination.

20 C.F.R. § 416.927(e).  Any medical opinion on one of these ultimate issues is

entitled to no deference because it "invades the province of the Commissioner

to make the ultimate disability determination."  <u>House</u>, 500 F.3d at 745 (citing

<u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir. 2002)).  <u>See</u> 20 C.F.R.

§ 416.927(e)(3).  The ultimate issues reserved to the Agency are as follows:

1.    whether the claimant is disabled;

2.    whether the claimant is able to be gainfully employed;

3.    whether the claimant meets or exceeds any impairment in the
      Listing of Impairments (appendix 1 to subpart P of part 404 of 20
      C.F.R.);

4.    what the claimant's RFC is; and

5.    what the application of vocational factors should be.

<u>See</u> 20 C.F.R. § 416.927(e)(1) and (2); <u>see also</u> <u>Wagner</u>, 499 F.3d at 849 (the

ALJ "need not adopt the opinion of a physician on the ultimate issue of a

claimant's ability to engage in substantial gainful employment.") (quoting Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)). The RFC determination is specifically noted to be one of those determinations that is an ultimate issue for the Agency to determine. 20 C.F.R. § 416.927(e)(2); Cox, 495 F.3d at 619-620.

In evaluating a treating physician's opinion, the ALJ must "always give good reasons" supporting his decision of the weight afforded that opinion. Nowling, 813 F.3d at 1123; Reed, 399 F.3d at 921; 20 C.F.R. § 404.1527.

In the Nowling case, Nowling's treating physician described her in a medical source statement as seriously limited or unable to meet competitive standards such as the ability to maintain regular attendance at work and be punctual, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to respond appropriately to changes in work routine, and to deal with stress of semiskilled and skilled work. Nowling, 813 F.3d at 1117. The ALJ discounted this treating physician's opinion of Nowling's functional abilities, claiming it was inconsistent with other (nontreating) experts' opinions and with the treating physician's own records. Id. at 1123. In support of his opinion, the ALJ highlighted one entry in the treating physician's notes showing Nowling had a GAF of 56 and had demonstrated "improvement."[16] Id.

---

[16] GAF stands for Global Assessment of Functioning. GAF uses a scale from 0 to 100 to indicate social, occupational and psychological functioning with a 100 being the most healthy mentally. A GAF of 41 to 50 indicates serious symptoms/impairment in social, occupational, or school functioning while a GAF of 51 to 60 indicates moderate symptoms or difficulty. Nowling, 813 F.3d at 1115 n.3. Both the Eighth Circuit and the Commissioner have recognized that GAF scores have limited importance. Id.

The court held the GAF score was "of little value" and, in any event, Nowling had consistently had GAF scores of 45 to 50 over the course of two years and 38 therapy sessions.  Id. at 1115-16.  The one-time GAF score of 56 was an anomaly.  Id.  Furthermore, in highlighting the fact that Nowling exhibited improvement on one occasion, the ALJ failed to recognize that Nowling's mental impairments waxed and waned over a substantial treatment period, that her symptoms were unpredictable and sporadic, and that her structured living environment had an effect on the manifestation of her symptoms.  Id.  Here, the court held, the ALJ failed to give good reasons for discounting the treating physician's opinion because the ALJ failed to acknowledge the nature of the mental disorder at issue and the longitudinal treatment record.  Id.  The court remanded to the agency.  Id.

In the House case, the ALJ's decision disregarding the treating physician's opinion was affirmed, in large part because there were "profound" inconsistencies between the treating physician's opinion on the one hand, and the medical evidence and the claimant's own testimony on the other.  House, 500 F.3d at 744-745.  The ALJ had determined that the claimant suffered from a severe impairment that left him unable to perform his past relevant work, but that he retained the RFC to perform certain unskilled sedentary jobs.  Id. at 742.  The key issue as to the claimant's ability to perform unskilled sedentary work turned on whether he could sit for prolonged periods of time.  Id. at 743-745.

The medical records established restrictions on the claimant's ability to stand and walk, but not on his ability to sit.  <u>Id.</u>  The claimant's own statements in questionnaires and testimony at the hearing also indicated that his impairment affected his ability to stand and walk, but not to sit.  <u>Id.</u>  The treating physician's opinion that there were significant limitations on the claimant's ability to sit came only in response to a letter from the claimant's lawyer and only after the case had been remanded from the Appeals Council back to the ALJ for additional findings.  <u>Id.</u> at 743.  Under these facts, the ALJ was justified in finding that the treating physician's statement was inconsistent with the medical evidence on the whole.  <u>Id.</u> at 743-745.

In <u>Dolph v. Barnhart</u>, 308 F.3d 876, 876 (8th Cir. 2002), the claimant alleged disability from a combination of kidney disease which caused hypertension, degenerative disease of the cervical spine, and carpal tunnel syndrome.   The ALJ denied benefits, finding that the claimant retained the RFC to perform past relevant work.  <u>Id.</u> at 878.  In reaching this conclusion, the ALJ disregarded a portion of the RFC assessment completed by the claimant's kidney doctor.  <u>Id.</u> at 878-879.  This was assigned as error by the claimant on appeal.  <u>Id.</u>

The Eighth Circuit affirmed, noting that the ALJ fully credited the treating physician's opinion about the claimant's kidney disease because this was within the treating physician's area of specialty.  <u>Id.</u> at 879. However, the ALJ gave less weight to the kidney doctor's RFC assessment of the claimant's cervical spine degeneration and carpal tunnel.  <u>Id.</u>  The kidney doctor had not

71

treated the claimant for these neck and arm conditions and had not made any clinical findings concerning these conditions. Id. The Eighth Circuit found that the ALJ's analysis of the kidney doctor's RFC assessment was consistent with the regulations governing how medical opinions are to be weighed and evaluated. Id. See also Reed, 399 F.3d at 922 (noting that less weight may be accorded to a treating physician's opinion where that opinion concerns a condition outside the physician's specialty, for which he did not treat the claimant and as to which he had not made any clinical findings).

In Wagner, the Eighth Circuit affirmed the ALJ's decision to discount a particular medical opinion of the claimant's treating physician where that particular opinion was inconsistent with two other opinions he gave about the claimant on the same subject on two other occasions, one predating the opinion that was discounted, and one postdating that opinion. Wagner, 499 F.3d at 849-850.

### 2. Michalene Stevermer, D.O.

Dr. Stevermer, a doctor of osteopathic medicine and psychiatric resident, issued an opinion about Ms. Wellman's mental limitations. AR828-30. In that opinion, Dr. Stevermer stated Ms. Wellman had mild limitations in sustained concentration and persistence. AR828. She also opined Ms. Wellman was moderately limited in the ability to perform activities within a schedule, to maintain regular attendance, and be punctual. AR829. She had moderate limits in her ability to work in coordination with or proximity to others without being distracted by them. Id. Ms. Wellman had mild limitations in the ability

72

to sustain an ordinary routine without special supervision and the ability to make simple work-related decisions.  Id.  She had *marked* limits in her ability to work a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Id.

Dr. Stevermer also found Ms. Wellman to have moderate limits in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Id.  She had mild limitations in her ability to accept instructions and respond appropriately to criticism from supervisors. Id.

Dr. Stevermer opined Ms. Wellman had mild limitations in her ability to respond appropriately to changes in the workplace and to be aware of normal hazards and take appropriate precautions.  AR830.  She had moderate limitations in her ability to travel to unfamiliar places, take public transportation, set realistic goals, and to make plans independent of others. Id.  Dr. Stevermer wrote that Ms. Wellman "has fairly significant anxiety symptoms which have interfered with her day-to-day functioning as well as depressive symptoms which has led to poor concentration and decreased motivation."  Id.  Dr. Stevermer indicated these limitations about which she had opined had been in effect for the duration of her treatment of Ms. Wellman. Id.

The ALJ stated as to Dr. Stevermer's opinion that he was assigning "some weight."  AR56.  He stated he "acknowledged" her statement that

Ms. Wellman "has significant anxiety symptoms which have interfered with her day-to-day functioning as well as depression symptoms which lead to poor concentration and decreased motivation." Id. However, the ALJ rejected Dr. Stevermer's opinion to the extent she opined Ms. Wellman's mental impairments limited her functioning greater than the ALJ found when setting forth Ms. Wellman's RFC. Id.

The ALJ noted that Dr. Stevermer found Ms. Wellman had no limitations or only mild limitations is many areas, an opinion with which the ALJ agreed. AR57. The ALJ also agreed with Dr. Stevermer's opinion that Ms. Wellman had moderate impairments in the following: ability to work in coordination with or proximity to others without being distracted by them; in accepting instruction and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; traveling to unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others. Id. The ALJ concluded these opinions by Dr. Stevermer were reasonably consistent with the overall record and the ALJ's own determination of Ms. Wellman's mental RFC. Id.

The ALJ *disagreed* with Dr. Stevermer's opinion that Ms. Wellman was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Id. The ALJ held Dr. Stevermer's opinion in this regard enjoyed *some* support in the record when applied to Ms. Wellman's previously-held jobs which were at

the skilled level.  Id.  However, the ALJ was proposing that Ms. Wellman could do other jobs at a "basic" rather than skilled level, and he rejected Dr. Stevermer's opinion as applied to "basic" jobs instead of "skilled" jobs.  Id.

First, the court notes it is questionable whether Dr. Stevermer can be considered a treating physician at the point at which she issued her medical source statement.  Ms. Wellman sought and received medical and counseling services for her mental impairments for approximately 10 years from Dr. Benson.  AR89.[17]  However, after she lost her job at MetaBank, she began going to SEBH to receive those services.  Id.  As the court understands it, SEBH is a no- or low-cost clinic.  Id.  Medical care at SEBH is provided by a revolving set of interns that change every year.  Id.  Thus, Ms. Wellman was seen numerous times at SEBH, but the court can locate only one treatment record from Dr. Stevermer prior to the ALJ hearing.  AR784-87.  That treatment record is dated July 20, 2015.  Id.  There are two treatment records dated post-hearing showing Dr. Stevermer saw Ms. Wellman on October 5, 2015, and January 11, 2016.  AR20-22, 39-42.  However, Dr. Stevermer did not have the benefit of observing and treating Ms. Wellman these two additional times at the time she issued her medical source statement in August, 2013.  At that time, Dr. Stevermer had only seen Ms. Wellman once.

---

[17] The transcript of the oral testimony at the ALJ hearing says "Benson." AR89.  However, the court believes this may be a transcription error as there are numerous medical documents in the record from Dr. Berne *Bahnson*, who was Ms. Wellman's attending physician during her psychiatric hospitalizations. See, e.g., AR664-708.

Although there are several SEBH treatment records from Benita Timpe and Lindsey Knoll, neither of these medical sources provided the medical source opinion as to Ms. Wellman's mental impairments. Presumably, by the time Ms. Wellman or the ALJ requested SEBH to fill out a medical source statement, these other medical sources had finished their rotations at SEBH and were no longer available.

In evaluating a medical source opinion, the ALJ was required to consider whether the medical source had treated the claimant, how long the treatment relationship had lasted, and whether the medical source had examined the claimant. 20 C.F.R. § 404.1527. Although Dr. Stevermer did treat Ms. Wellman once before issuing the medical source opinion, her opinion certainly does not carry the same weight as, for example, an opinion from Dr. Benson would have because he would have had a longitudinal view of Ms. Wellman's mental impairments. A treatment relationship of some duration is especially important here, where it is acknowledged that Ms. Wellman's symptoms from her anxiety and depression wax and wane over time. Dr. Stevermer had a one-time interaction with Ms. Wellman before issuing her medical source opinion. It is hard to know where, on the continuum of Ms. Wellman's symptoms, Dr. Stevermer found her in that short window of observation.

Nevertheless, the court presumes that Dr. Stevermer would have had access to all of Ms. Wellman's medical records at SEBH, including those that were created by other medical sources before Dr. Stevermer's arrival at SEBH.

That means Dr. Stevermer's opinion would have relied heavily on a retrospective view—she would have understood that Ms. Wellman in fact experienced numerous absences at her prior jobs and interference in the performance of those jobs from psychological symptoms. The ALJ was correct in noting that Dr. Stevermer's opinion was based on how Ms. Wellman performed at her past jobs, which were skilled jobs. Dr. Stevermer was not asked for a medical opinion about how Ms. Wellman would do at a "basic" unskilled job.

The first area of functioning with which the ALJ disagreed was Ms. Wellman's ability to complete a normal workday or workweek without interruptions from psychological symptoms. Ms. Wellman's anxiety and depression manifest themselves in their more acute phases as a fear of leaving the house, among other ways. In fact, Ms. Wellman has been diagnosed with agoraphobia. The ALJ did not adequately explain how switching from a "skilled" job to a "basic" job would change this psychological symptom of being afraid to leave the house. It would be equally frightening to leave the house for one with Ms. Wellman's conditions whether one was leaving to attend a skilled job or an unskilled job. The ALJ did not adequately explain why he rejected this part of Dr. Stevermer's opinion. The Commissioner's regulations required the ALJ to give "good reasons" for his treatment of Dr. Stevermer's opinion. See 20 C.F.R. § 404.1527(c)(2).

Also, the record contains evidence of four psychiatric hospitalizations of Ms. Wellman: (1) in 2003 or 2006 of unknown duration; (2) in 2007 or 2009,

also unknown duration; (3) a 5-day hospitalization in June, 2013, followed by a

one-month period of partial hospitalization; and (4) a 5-day hospitalization in

January, 2014.[18]  AR328, 663-65, 698, 707, & 745.  The last two

hospitalizations occurred within six months of each other, one of which

occurred during the period of disability under consideration.  Although these

do not qualify as episodes of decompensation of extended duration,[19]

nevertheless they surely were interruptions in Ms. Wellman's ability to work.

They provide support for Dr. Stevermer's opinion that Ms. Wellman's mental

impairments "markedly" affect her ability to "work a normal workday and

workweek without interruptions from psychologically based symptoms."  This

evidence is not discussed in connection with the ALJ's treatment of

Dr. Stevermer's opinion.

    The second area of functioning with which the ALJ disagreed was

Ms. Wellman's ability to perform a job without an unreasonable number of rest

periods.  Presumably, a basic job has fewer mental demands than a skilled job.

Moreover, although there is evidence in the record of Ms. Wellman missing

---

[18] In her narrative to the Commissioner, Ms. Wellman identifies the earlier hospitalizations to have occurred in 2003 and 2007.  AR328.  However, in 2014, she told Benita Timpe at SEBH that she had been hospitalized eight years prior and five years prior, which would have been 2006 and 2009.  AR745.  The actual dates are far outside the period of disability under consideration and are not material.  What is material is that they occurred.

[19] Whether mental impairments result in episodes of decompensation of extended duration is a question the ALJ must consider when deciding whether Ms. Wellman met or exceeded a listed impairment at Step 3.  See 20 C.F.R. Pt. 404, subpt. P, app.1 § 12.00(C)(4).  The Commissioner defines such episodes as three or more episodes which occur within a one-year period and that each last at least two weeks.  Id.  None of Ms. Wellman's psychiatric hospitalizations meet this definition.

78

*days* of work, there is no medical evidence—aside from Dr. Stevermer's medical source statement--in the record that she needs periods of rest *within* a workday. Ms. Wellman did testify that during her brief stint of employment at First Premier Bank, she retreated to the bathroom 7 to 10 times per day to deal with the stress. AR86-87. However, the First Premier Bank job also appears to have been a skilled job. Therefore, the court finds the ALJ's rejection of this portion of Dr. Stevermer's opinion is both adequately explained in his decision and supported by substantial evidence in the record.

The court recommends remanding this matter back to the ALJ to reconsider the portion of Dr. Stevermer's opinion dealing with Ms. Wellman's ability to perform a job without interruption from psychologically-based symptoms.

### 3. Dr. R. Maclean Smith

Ms. Wellman has seen Dr. R. Maclean Smith since 2006 for allergies and asthma. AR831. The record contains six treatment records from Dr. Smith in addition to his medical source statement as to Ms. Wellman's pulmonary RFC. AR547-52, 782-83, 831-33. Those records reflect Ms. Wellman saw Dr. Smith approximately once per year from October, 2012, to July, 2015. Id.

Dr. Smith gave a pulmonary residual functional capacity statement on August 18, 2015. AR831-33. In that statement, Dr. Smith stated Ms. Wellman has diagnoses of allergic rhinitis, vasomotor rhinitis, asthma, and chronic angioedema of unknown etiology. AR831. Dr. Smith stated Ms. Wellman has acute asthma attacks from allergens and irritants, which Dr. Smith

characterized as "mild to moderate."  Id.  The last time Ms. Wellman had an

attack was June, 2013, when she complained of nasal and respiratory

symptoms and exhibited normal spirometry.  Id.  Dr. Smith stated

Ms. Wellman "rarely" has attacks.  Id.  Dr. Smith stated Ms. Wellman is better

with treatment in the form of steroid bursts over 7 days.  Id.

Dr. Smith stated Ms. Wellman is not a malingerer and emotional factors

do not contribute to the severity of her symptoms or her functional limitations.

Id.  Dr. Smith stated that Ms. Wellman's symptoms would be severe enough to

interfere with attention and concentration needed to perform simple tasks

"occasionally."  Id.  Dr. Smith noted Ms. Wellman has a decreased threshold for

irritants like fragrances and smoke and that she had had some issues with

fragrances in some office settings.  Id.

Dr. Smith termed Ms. Wellman's prognosis as "good."  AR832.  She

stated Ms. Wellman's symptoms could be expected to last at least 12 months.

Id.  Dr. Smith stated Ms. Wellman should avoid all exposure to cigarette

smoke, and avoid even moderate exposure to perfumes, fumes, odors, gases,

and dust.  Id.  Dr. Smith stated Ms. Wellman's impairments would produce

both good and bad days.  Id.  Dr. Smith estimated Ms. Wellman's impairments

would result in her missing one day of work approximately once per month, or

once every two months.  Id.

The ALJ generally accurately set forth Dr. Smith's opinion in his written

decision with two exceptions.  AR56.  The ALJ stated Dr. Smith opined

Ms. Wellman would miss one day of work every two months, whereas what

Dr. Smith actually opined was that Ms. Wellman would miss one day of work per month *or* one day every two months.  Compare AR56 to AR832.  The ALJ characterized Dr. Smith as seeing Ms. Wellman "a couple of times" during the period of alleged disability.  AR56.  While technically correct, this statement fails to acknowledge Ms. Wellman had been a patient of Dr. Smith's for 9 years and that Ms. Wellman saw Dr. Smith annually.

The ALJ stated he was according "partial weight" to Dr. Smith's opinion, but did not specify which part, if any, of Dr. Smith's opinion the ALJ refused to credit.  AR56.  Dr. Smith stated Ms. Wellman should avoid *all* exposure to cigarette smoke, and avoid even moderate exposure to perfumes, fumes, odors, gases, and dust.  AR832.  The ALJ posited in Ms. Wellman's RFC that she "must avoid any concentrations of dusts, fumes, odors, gases, aerosols in the air, and poor ventilation."  AR50.  Because the ALJ did not mention smoke and perfume in his RFC, the court infers that *this* is the portion of Dr. Smith's opinion the ALJ rejected—Dr. Smith's opinion that Ms. Wellman should avoid smoke and irritants like perfume.  The ALJ does not even acknowledge that this is the portion of Dr. Smith's opinion he is not crediting.  Because he does not even acknowledge this fact, he also does not explain the fact.

The Commissioner argues that the ALJ's reference to "aerosols" in his RFC was meant to include perfumes as well as other "scented fine sprays that someone could release in the air."[20]  See Docket No. 18.  The court disagrees.

_____

[20] Neither party addresses the ALJ's discrediting of Dr. Smith's opinion regarding cigarette smoke.  Because of the pervasive nature of governmental bans on smoking in work places and places of public accommodations in

First of all, perfume comes in many forms, some aerosol, some oil, and some solid. Dr. Smith opined that Ms. Wellman should avoid perfume, not just aerosol perfume. Secondly, when a person wears perfume, it is unlikely that he or she sprays it into the air—instead, it is applied to the body. The ALJ's RFC specified that Ms. Wellman need only avoid "aerosols *in the air*," not aerosols that had been applied to one's body at one's home, the most typical method of wearing perfume.

Alternatively, the Commissioner argues that Ms. Wellman has not proven her sensitivity to perfumes restricts her from working in *any* office environment. That may be true. There are some doctors' offices, in particular allergists' offices, which ban the wearing of perfumes or colognes on the premises. But this is not the type of job setting the ALJ ultimately concluded Ms. Wellman could perform—both jobs he opined she could perform are in normal office settings where fellow employees might wear cologne or perfume. This court concludes the ALJ rejected Dr. Smith's opinion as to perfumes. The Commissioner requires ALJs to "give good reasons in [their] notice of determination or decision for the weight we give your treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). Here, the ALJ failed to explain why he rejected Dr. Smith's opinion as to perfumes.

The court examines whether there is substantial evidence in the record to support the ALJ's treatment of Dr. Smith's opinion. Although Ms. Wellman

recent years, the court finds it unlikely Ms. Wellman would have to encounter cigarette smoke in either of the jobs the ALJ concluded she could perform. The court takes the parties' ignoring of the issue to be an indication that they concluded the same thing as the court.

had been a patient of Dr. Smith's for 9 years as of the date of the ALJ hearing, the court does not have the benefit of most of those records so as to form a longitudinal view of Ms. Wellman's pulmonary health. Instead, the court has a handful of records.

The oldest of Dr. Smith's record is dated October 18, 2012. AR549. In that record, Dr. Smith states Ms. Wellman had one episode of throat swelling since the last time she saw Dr. Smith and that episode was triggered by cologne. Id. Ms. Wellman stated her asthma had been "ok," but that she had developed bronchitis following her second shunt revision surgery. Id.

Ms. Wellman next saw Dr. Smith on June 10, 2013. AR550. She told Dr. Smith she was having bad allergies for the last two months with runny nose, phlegm, sneezing, headaches, itchy eyes, and very itchy ears. Id. She was also having breathing problems. Id. Ms. Wellman described missing work the past month due to how severe her allergies had been. Id. She also stated she had contracted bronchitis three times last winter. Id. Dr. Smith prescribed prednisone for Ms. Wellman's symptoms. Id. Ms. Wellman stated she would like to have allergy shots like she had had in her 20s as she felt they helped her for a good 10 years. Id.

On June 24, 2013, Ms. Wellman reported to Dr. Smith's office for allergy testing. AR547, 551-52. That testing indicated she was allergic to 4 different kinds of dusts and pollens and 7 different kinds of mold or dander. AR547. There was no apparent testing for sensitivities to cologne or perfume as those substances were not listed on the form record. Id.

Ms. Wellman next saw Dr. Smith on July 25, 2014. AR782. Ms. Wellman reported doing a lot better since her last visit. Id. It had been 8 or 9 months since she had experienced a throat-swelling episode and had to use her epipen. Id. She reported she had not had to use her inhaler for 5 months. Id. There is no indication whether Ms. Wellman resumed taking allergy shots after she had been tested in June, 2013. Id.

The final visit in the record from Dr. Smith's office was when Ms. Wellman saw Dr. Smith on July 9, 2015. AR783. On that occasion, Ms. Wellman reported she had not had to use her epipen for the entire year since she had last seen Dr. Smith. Id.

The ALJ wrote in his opinion that Ms. Wellman had been "doing well" in July of 2014 and 2015. AR56. He also stated Ms. Wellman's respiratory impairments presented no particular issues for her as long as she complied with medication management. Id. However, this is not congruent with the few records from Dr. Smith that are in the record.

Ms. Wellman was not employed from June, 2013, until the ALJ hearing, with a brief exception where she was employed at First Premier Bank from November, 2013, to January, 2014. AR53. This period of employment ended when Ms. Wellman suffered a psychiatric hospitalization. Id. Therefore, if her throat swelling episodes were triggered by cologne or perfume in the workplace, as Dr. Smith's records indicate, there would be a good reason her symptoms were better in 2014 and 2015—she was not in the workplace and being exposed to other employees' scents. This is similar to the situation in Nowling

where the ALJ failed to take into consideration the effect of the claimant's structured living environment on the frequency and severity of his symptoms. Nowling, 813 F.3d at 1123.

Even though Ms. Wellman was not working from June, 2013, to July, 2014, she had at least one episode of throat swelling and had to use her inhaler during that year as well. AR782. It would be helpful to know if the one episode of throat swelling or the inhaler usage occurred in the workplace at First Premier Bank or elsewhere. The record is silent.

Had the ALJ exercised his duty to develop the record and requested other years' records from Dr. Smith, the court might have been able to discern whether Ms. Wellman had other periods of repose where her symptoms abated during a time of unemployment, or whether she had periods of repose *while* she was employed. The latter would tend to support the ALJ's apparent conclusion that Ms. Wellman's sensitivities to perfume/cologne could be well controlled by medication rather than environment. With the few records available, and with Dr. Smith's long treatment history with Ms. Wellman, and with the ALJ's lack of clear explanation in his opinion as to which parts of Dr. Smith's opinion he was rejecting and why, the court is left to speculate. Instead of doing so, the court recommends remanding this matter back to the ALJ to further consider Dr. Smith's opinion, to decide whether to request additional records from Dr. Smith, and to pinpoint whether Ms. Wellman's throat-swelling between June, 2013, and July, 2014, occurred in the workplace or outside of it.

**G.  Does Substantial Evidence Support the ALJ's Conclusion that Ms. Wellman Could Perform Other Work?**

The final issue Ms. Wellman raises is whether the ALJ erred at Step Five of his analysis in concluding there were two jobs Ms. Wellman could perform. The ALJ concluded Ms. Wellman could perform the jobs of **office helper** (Dictionary of Occupational Titles "DOT" 239.567-010), and **telephone survey worker** (DOT 205.367-054).  AR58.  Both of these positions are unskilled.  Id.

The error asserted by Ms. Wellman arises out of discrepancies she alleges exist between the hypothetical posed by the ALJ to the VE containing Ms. Wellman's functional limitations, and the actual requirements of the jobs the VE testified she could perform.  Both jobs require either frequent or occasional talking and hearing according to Ms. Wellman, whereas the ALJ restricted her to a job that required only brief, superficial contact with others.  Thus, the VE's opinion is contrary to the DOT job descriptions for these jobs and the ALJ's hypothetical.

Also, the ALJ's hypothetical limited Ms. Wellman to jobs involving only simple, routine and repetitive tasks of three steps on average.  Both the jobs identified by the VE require more than this level of intellectual functioning according to Ms. Wellman.

The Commissioner argues that the office helper job is primarily solitary and would therefore not run afoul of the requirement that Ms. Wellman be limited to brief and superficial contact with others.  Although the Commissioner acknowledges the telephone survey worker job requires frequent talking and listening with others, she argues that this job requirement is

nevertheless "brief and superficial" because it is with strangers over the telephone rather than with coworkers with whom one has an ongoing relationship.

As to the complexity of these two jobs, the Commissioner argues the DOT job descriptions are consistent with the ALJ's hypothetical. Alternatively, the Commissioner asserts the office helper job alone is consistent, and argues the court can affirm the Commissioner's decision based on the officer helper job alone. See Docket No. 14 at p. 21 n.2. Finally, the Commissioner seems to suggest the record supports Ms. Wellman working at a job with a complexity level far above what the ALJ set forth in his hypothetical because she has a history of working at such complex jobs. Id. at 21.

Social Security Ruling 00-4p sets forth the agency's handling of conflicts between a VE's testimony and job descriptions found in the DOT and its companion publication, the Selected Characteristics of Occupations Defined in the Revised DOT ("SCO"). ALJs may take administrative notice of reliable job information available from various publications, including the DOT and SCO. SSR 00-4p at *2 (Dec. 4, 2000) (citing 20 C.F.R. § 404.1566(d)). ALJs may also use VEs as sources of occupational evidence. Id. (citing 20 C.F.R. § 404.1566(e)).

Where VE evidence is given, it should be consistent with occupational information in the DOT and SCO. Id. The ALJ has a duty to develop the record and to inquire on the record as to whether the VE's testimony is consistent with these publications. Id. Neither the VE's testimony nor the

DOT/SCO "trump" the other, so it is important for inconsistencies to be identified and resolved on the record. Id. Where an inconsistency exists, the ALJ "must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled." Id. at *4 "The adjudicator will explain in [his decision] how he . . . resolved the conflict." Id. "The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified." Id.

The Commissioner cites Moore v. Astrue, 623 F.3d 599 (8th Cir. 2010), for the proposition that this case need not be remanded. In Moore v. Astrue, the claimant had borderline intellectual functioning and the ALJ determined he was able to perform jobs that involved "simple job instructions" and involved performance of "simple, routine and repetitive work activity at the unskilled task level." Id. at 601. Based on these limitations, among others, the VE testified Moore could perform the jobs of "hand packager" and "laundry worker." Id. at 602. On appeal, Moore argued that the two jobs identified by the VE required more intellectual ability than set forth by the ALJ in his hypothetical. Id.

Specifically, Moore argued these jobs required "Level 2" reasoning, defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." Id. at 604. Moore asserted the ALJ's hypothetical limited him to jobs with "Level 1" reasoning, defined as the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions." Id. Thus, the difference was whether

88

the jobs involved "simple one- or two-step instructions" or "detailed but uninvolved" instructions.  Id.

The court held there was no conflict between the stated limitations set forth by the ALJ and those set forth in the DOT.  Id.  The ALJ said the job should involve "simple" instructions; he did not specify "one- or two-step instructions."  Id.  The Level 2 jobs identified by the VE included "uninvolved" instructions, which the court noted was defined as "not involved," and the opposite of "complicated."  Id.  This was synonymous with "simple."  See also Jones ex rel Morris v. Barnhart, 315 F.3d 974, 979 (8th Cir. 2003) (refusing to reverse on an alleged conflict between the VE's testimony and DOT job description where the court found no such conflict existed).

Ms. Wellman relies upon Kemp ex rel. Kemp v. Colvin, 743 F.3d 630 (8th Cir. 2014).  In Kemp, the ALJ set forth in his hypothetical the limitation that the claimant was limited to reaching overhead only occasionally.  Id. at 632. The VE opined the claimant could do the job of checker-weigher, which the DOT described as requiring "constant" reaching.  Id. at 632-33.  This conflict between the VE's testimony and the DOT job description was not recognized and addressed by either the ALJ or the VE.  Id. at 633.  The Eighth Circuit remanded back to the agency to consider the issue.[21]  Id.

_____

[21] The Kemp court held that when there is a conflict between a VE's testimony and the DOT, the DOT "controls" unless its classification is rebutted.  Kemp, 743 F.3d at 632 (citing Jones v. Astrue, 619 F.3d 963, 968 (8th Cir. 2010)). This conflicts with the agency's ruling that neither "trumps" the other.  SSR 00-4p at *2.  The court need not resolve this conflict between court precedent and agency rulings because the ALJ simply did not acknowledge or address the

Similarly, in <u>Moore v. Colvin</u>, 769 F.3d 987, 989 (8th Cir. 2014), the ALJ limited the claimant to jobs that only "occasionally required overhead reaching bilaterally." The VE testified the claimant could do two jobs, both of which required "frequent" reaching. <u>Id.</u> Nevertheless, this conflict between the VE's testimony and the DOT job descriptions was not acknowledged and addressed on the record. <u>Id.</u> When asked by the ALJ, the VE testified her testimony was consistent with the DOT. <u>Id.</u> The court held the ALJ's duty to identify and resolve conflicts between VE testimony and the DOT was not absolved simply because the VE testified (erroneously) that there was no conflict. <u>Id.</u> The court remanded to the agency to address the conflict. <u>Id.</u>

The job of survey worker requires significant speaking or signaling; vocational preparation more than a short demonstration but less than one months' training; writing compound and complex sentences with proper punctuation, adverbs and adjectives; speaking clearly and distinctly with appropriate pauses, emphasis, correct punctuation, variations in word order, and proper tenses; and applying commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form—dealing with problems involving several concrete variables in or from standardized situations. <u>See</u> DOT 205.367-054, 1991 WL 671725. Survey worker does not involve any kneeling, crouching or stooping. <u>Id.</u> The job requires talking and hearing more than 1/3 of the time and up to 2/3 of the time. <u>Id.</u> A census enumerator is a type of survey worker. <u>Id.</u>

conflict between the VE's testimony and the DOT job descriptions in Ms. Wellman's case.

The requirements of survey worker clearly conflict with the ALJ's limitation that Ms. Wellman have no more than brief and superficial contact with people and perform only simple, repetitive tasks. The description of the job includes interviewing people using specified questions on a questionnaire and recording the answers, as well as reviewing, classifying, and sorting questionnaires following certain criteria. Id. This would require extended contact with the people being interviewed. The written and verbal skills required are more complex than "simple, repetitive tasks."

The Commissioner tacitly acknowledges the job of telephone survey worker conflicts with Ms. Wellman's RFC as set by the ALJ when it urges the court to affirm based on the job of office helper. The speaking, reading, writing, and vocational preparation requirements for office helper are the same as for survey worker. Compare DOT 239.567-010, 1991 WL 672232, with, DOT 205.367-054, 1991 WL 671725. The speaking-signaling component of this job, however, is "not significant," but does require talking up to 1/3 of the time and hearing for an equal amount. See DOT 239.567-010, 1991 WL 672232. It does not require kneeling or crouching, but does require occasionally stooping. Id.

The job of office worker does correspond with the ALJ's limitation that Ms. Wellman have only brief and superficial contact with others. However, the skill level required for speaking, reading, writing, and vocational preparation indicate a job with more than "simple, repetitive tasks."

Neither the ALJ nor the VE in this matter identified any conflicts between the VE's testimony and the DOT descriptions of the jobs of office worker and telephone survey worker. Therefore, the ALJ did not resolve the conflict between the VE and the DOT. For these reasons, the court recommends this case be remanded to the ALJ to address the conflict and state how he resolves it. Kemp, 743 F.3d 633.

**H.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Wellman requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only

two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, this magistrate judge hereby respectfully RECOMMENDS that the Commissioner's decision should be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED November 9, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge